**UNITED STATES of America,**
**Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA**
**and Rome Cable Corporation,**
**Defendants.**

**Civ. No. 8030.**

United States District Court
N. D. New York.

Jan. 28, 1963.

See also 193 F.Supp. 251.

502

Justin J. Mahoney, U. S. Atty., Albany, N. Y., for plaintiff, Donald F. Melchior, Charles D. Mahaffie, Jr., Richard J. Wertheimer, Attys., Dept. of Justice, Washington, D. C., of counsel.

Ferris, Hughes, Dorrance & Groben,. Utica, N. Y., Bergson & Borkland, Washington, D. C., William K. Unverzagt,. Pittsburgh, Pa., for defendants, Robert. Groben, John Liddy, Utica, N. Y., Herbert A. Bergson, Howard Adler, Jr.,. Hugh Latimer, John Voortman, Washington, D. C., of counsel.

BRENNAN, Chief Judge.

This is a civil antitrust action brought by the United States against the Aluminum Company of America, hereinafter referred to as "Alcoa" and the Rome Cable Corporation, hereinafter referred to as "Rome" to annul the acquisition by Alcoa of the stock and assets of Rome.

The complaint in this action was filed April 1, 1960 and charges that the acquisition, above referred to, is in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The complaint seeks the usual relief in this type of case—to wit: an order of divestiture and injunction against further acquisitions and such other and further relief as may be just and proper. Defendants' answers, while ad-·

mitting certain allegations of the complaint, deny that the transaction involved is in violation of the statute. No question is raised as to the jurisdiction of this court.

On March 31, 1959, pursuant to a prior agreement, Alcoa acquired all of the assets of Rome by an exchange of stock of the two corporations. Title to the assets of Rome was taken in a newly formed corporation also known as the Rome Cable Corporation. The new company is a wholly owned subsidiary of Alcoa and, since the acquisition, has been operated as a division thereof. The crux of the litigation arises from plaintiff's contention that the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly in certain lines of commerce consisting principally of wire and cable products—all in violation of Section 7 of the Clayton Act.

Brief reference is made at this point to the defendants and the general nature of their business activities in order to afford an insight into the more detailed discussions to follow.

Alcoa is a fully integrated aluminum producer. In the manufacturing process, it refines aluminum bearing ore into primary aluminum and converts same into intermediate and various aluminum end products. It manufactures such products in several states and sells and ships same in various forms throughout the United States and in foreign countries.

Rome was incorporated in 1936. It was and is primarily engaged in the manufacture of wire and cable products in which copper was and is the predominant metal used in its operations. In 1952 Rome installed equipment for the manufacture of aluminum rod from aluminum ingot purchased from primary producers. It began producing such rod for its own use in 1953. Thereafter it began to manufacture and sell certain types of aluminum wire and cable in addition to its broad line of copper products.

## THE LAW

Before proceeding to discuss Alcoa's and Rome's position in the markets in which they are active participants, it would seem logical to refer briefly to the legal principles involved. An understanding of the language and purpose of the statute is essential as an approach is made to the decision which must necessarily involve the recognition of the prohibitions imposed and the application of same to the facts disclosed.

The basis of this action rests upon the provisions of Section 7 of the Clayton Act, 15 U.S.C. § 18, the relevant part of which is quoted below.

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The language of the above statute, taken alone, poses problems both in its construction and application. The courts have proceeded upon a case-to-case basis to construe and apply the statute to the facts of a particular litigation. It seems fair to state that the law involved is still in a state of development and that no formula, possessing rigidity, may be applied. This is necessarily so since the statute deals with reasonable probability in the constantly changing economy in which we live.

The recent decision of the Supreme Court in Brown Shoe Co. v. U. S., 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 is, as stated therein, the first case coming before that court wherein an analysis of the scope and purposes of the statute, as it now exists, was necessary to the issue raised. It would seem to follow

**504**

that reference to the holdings in that decision would be more profitable than to discuss how far the previous landmark decisions under the Sherman Act are applicable or to reconcile or distinguish decisions of circuit and district courts which had decided Section 7 cases prior to the Brown Shoe decision. The most often quoted decisions, referred to above, are either cited or are found in the notes in the Brown Shoe opinion and their application may be gathered from the text thereof.

The legislative history of the statute is discussed in, the above Brown Shoe Co. decision and does not require repetition here. Such discussion appears to confirm some previously stated purposes of the statute and sets at rest certain controversies relative to the meaning and application thereof. This court's understanding thereof is summarized below and the quotations therein are, unless otherwise indicated, taken therefrom.

■■■ Congress considered that " * * * a rising tide of economic concentration in the American economy" was an evil to be curbed. Effective competition and the protection of small businesses were results to be accomplished. The statute was intended to supply a deficiency in the existing statute and to apply to all types of mergers. Its purpose was to curb monopolistic acts at their beginnings or incipiency rather than await their fruition and the standards for judging their legality are broader than, but may include, those applied in Sherman Act violations. All mergers however are not to be condemned. Condemnation is limited to those having "demonstrable anticompetitive effects" although such demonstration is satisfied by a probability. Certainty is not required. Proof of probability is sufficient provided the menace to competition is clear-cut as distinguished from a temporary condition or an "ephemeral possibility". No particular tests are provided in the statute to measure either

the product or geographic market. Neither are qualitative or quantitative tests controlling in measuring the effect of a merger. Both measurements must be made in the light of all the relevant factors which may vary in accordance with the facts of the particular acquisition under consideration.

In addition to the above summary of the discussion of the legislative history as gathered from the opinion in the Brown Shoe case, the decision therein, in its holdings seems to otherwise clarify the vagueness of the language of the statute and afford something of a guide to the trial courts in their application to the facts of the litigation before them.

■■■ The lines of commerce or product market may consist of both broad and submarket lines. No rigid formula exists for their determination. The realities of competition are the ultimate test. The broad market line may be extended to cover a product where there exists "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it". Seven "practical indicia" are set forth as factors to be considered in determining the boundaries of a submarket. They are (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. The existence or non-existence of each of the above indicia is not determinative of the problem in itself. All relevant facts must be considered and we are admonished "to recognize competition where in fact competition exists". Peculiar characteristics and uses may be one of such indicia but it is not determinative. To be of effective weight, they must be so peculiar as to render the product "noncompetitive".

In determining the impact of the merger, the size of the share of the market foreclosed is not decisive unless it approaches monopoly proportions or is of de minimis effect. The market shares held by the merged companies are an index of market power to be applied in all aspects of the realities of competition in "an economically significant market". Mergers may not be condemned per se upon the basis of such shares alone; same "will seldom be determinative". The purpose of the merger is a most important factor as is the existence of trends toward concentration in the industry. The testimony of those engaged in industry has its weight and significance although "It is competition, not competitors, which the Act protests". An evaluation of the competitive realities disclosed, based upon a pragmatic factual approach, would seem to be the obligation of the trier of the facts.

## THE INDUSTRY

The litigation involves principally the effect of the merger as tending to lessen competition in certain aluminum product lines of commerce. In the decision of Brown Shoe Co. Inc. v. U. S., supra, 370 U.S. at 321, 82 S.Ct. at 1521-1522, 8 L.Ed.2d 510, we find the following quotation: " * * * Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry" and 370 U.S. at page 329, 82 S.Ct. at page 1526, 8 L.Ed. 2d 510 the court refers to the examination of "economic and historical factors" as necessary to the decision. It follows that the facts must be weighed and the law applied with some understanding of the industry as a whole and the status of both Rome and Alcoa therein.

The history of the aluminum industry in this country from its beginning to World War II is for all practical purposes a history of Alcoa itself. The economic demands of World War II account for the entry of competing primary aluminum producers, the details of which may be gathered from the lengthy court decisions which involve the position of Alcoa in the business of aluminum production and the sale of aluminum products within the United States. Such details may be gathered from the decisions —United States v. Alcoa, D.C., 44 F. Supp. 97; United States v. Alcoa, 2 Cir., 148 F.2d 416; United States v. Alcoa, D.C., 91 F.Supp. 333 and United States v. Alcoa, D.C., 153 F.Supp. 132. It is sufficient to say that principally due to government action during the above period, Reynolds Metal Company and Kaiser Aluminum and Chemical Corporation shared with Alcoa, then and now, a place in the aluminum industry as fully integrated aluminum producers.

The above corporations are described in their activities as fully integrated in that their facilities permit the processing of the necessary materials from the mine through the intermediate stages to the finished aluminum product. Statistics appear to be first available in the above process when same reaches the primary aluminum stage, so that for all practical purposes we are not particularly concerned with the status of industry prior to the production of primary aluminum. Three additional corporations have since 1955 joined Alcoa, Kaiser and Reynolds as such producers. These corporations—Ormet, Inc., (Olin Mathieson), Harvey Aluminum Company and Anaconda Aluminum Company, although not as fully integrated as Alcoa, Kaiser and Reynolds, are producers of primary aluminum. The above corporations are in a position to manufacture and sell aluminum billet, pig, ingot and rod which are termed intermediate products. Each of the above corporations, except Harvey, fabricates the intermediate products into numerous finished merchantable items, intended directly for consumer use. Included in such items are the wire and cable products urged as proper lines of commerce in this case. The five above companies, thus engaged in processing intermediate aluminum products, are considered as "integrated producers" as the term is used in this litigation

An indication of the status of the above companies engaged in producing primary aluminum may be gathered from the exhibit set out below—

## ALUMINUM INGOT CAPACITY EXISTING OR UNDER CONSTRUCTION AT THE END OF 1960
### (Short Tons)

| Company | Capacity | Percent of U. S. Total |
|---|---|---|
| UNITED STATES TOTAL | 2,655,750 | 100.0 |
| Aluminum Company of America | 1,025,250 | 38.6 |
| Reynolds Metals Company | 701,000 | 26.4 |
| Kaiser Aluminum & Chemical Corp. | 609,500 | 23.0 |
| Ormet, Inc. | 180,000 | 6.8 |
| Harvey Aluminum | 75,000 | 2.8 |
| Anaconda Aluminum Company | 65,000 | 2.4 |

The above percentage of total capacity of Alcoa differs slightly from that provided by the defendant which is set at 35%. This may be accounted for by the fact that Alcoa abandoned construction of a plant in Indiana when it was apparent that there was an oversupply of capacity. No doubt production figures are more meaningful than the above since it appears that 15% of Alcoa's primary aluminum capacity was unused in 1960. Alcoa's percentage of United States primary aluminum for 1960 was 36% of the total supply, having declined 9% from 1956. That Alcoa's percentage of such production has declined over a period of years is self-evident from the entry of new producers as indicated above but it would seem to be fair to say that the three principal producers supply around approximately 80% of such production. The record is indicative of a further increase in domestic aluminum capacity and production, both from the documentary evidence and the oral testimony. This increase would come about by entry of new producers and the increase in production capacity of Alcoa's present competitors.

Only brief reference need be made to the copper industry since it is involved only to a limited extent in this controversy. Copper products are manufactured from an ore from which intermediate products are refined and the end product eventually produced for consumer use. Like aluminum, there are companies which are so integrated as to be able to refine and produce copper products from the original ore to the finished items. Such companies sell intermediate products, such as ingot, to processors or fabricators, who then process same for ultimate use in their final form. There is no contention here that the merger involved has anti-competitive impact in the copper industry as a whole or upon the integrated copper producers or fabricators. No further discussion of the copper industry appears to be necessary.

We now turn to a brief discussion of the industry as it pertains to the particular lines of commerce involved in this litigation. The lines of commerce which are principally litigated here consist of those products capable of conducting electricity and are generally referred to as wire and cable products. While it is claimed that some of such lines involve both aluminum and copper, emphasis is placed principally upon aluminum wire and cable which are the end products of processing or fabricating an intermediate aluminum product such as ingot into the completed wire and cable which may be of various sizes, electrical conductive ca-

pacity and of different weight, size and strength.

There are a large number of firms engaged in the fabrication of wire and cable copper products. There are a lesser number of such fabricators engaged in the business of fabricating aluminum products. As the word "fabricators" is used in this litigation, it is distinguished from the integrated aluminum and copper producers who also fabricate and sell their end products. Upwards of two hundred fabricators are engaged in the manufacture of both aluminum and copper wire and cable products. There is a vigorous competition as to wire and cable between the integrated companies among themselves and between those fabricators whose process of manufacture begins with the intermediate product purchased from a primary aluminum producer. This active competition is also evident as between aluminum and copper wire manufacturers whose product may be used interchangeably. In other words, there is a lively competition between aluminum and copper products in certain areas which is accounted for by the increasing use of aluminum products and the economic factors which apply thereto. Both the aluminum and copper industries are important factors in the present day economic and business life They maintain effective and costly research departments designed to improve the efficiency of their products and to create new uses therefor. Both the copper and aluminum industry must meet competition at the intermediate manufacturing stage from foreign countries or concerns. Canada produces primary aluminum equal to about 35% of the total United States production and supplies a significant portion thereof which is available to this country's fabricators. European producers apparently furnish a small portion of primary aluminum for the use of American fabricators. In view of the above, no shortage in primary aluminum is foreseeable.

## THE STATUS OF ALCOA AND ROME IN THE INDUSTRY

Since Alcoa has not been engaged in the manufacture of copper products, its place in the industry, above described, is limited to the production, manufacture and sale of aluminum products. Its position in the aluminum industry is to some extent apparent in the above discussion.

Alcoa still maintains its position as the leading producer of primary aluminum. Its share in that market, as may be expected, has declined sharply since the entrance of competitors in that field. This decline has been reasonably consistent since the newcomers in the field reached productive capacity. In 1948, Alcoa had 52% of United States primary aluminum production. It declined to 45% by 1956 and from 1956 to 1960, it declined to 36%. Its percentage of primary aluminum capacity has declined substantially in the same manner.

Alcoa manufactures and sells a variety of aluminum products. This litigation however involves primarily wire and cable products so that reference to its position in the market will be limited thereto. Alcoa pioneered the use of aluminum as an electrical conductor and sold substantially all of the aluminum cable used for electrical transmission in the United States prior to World War II. Since that time, Alcoa has encountered increased competition and its relative participation in the above market has declined materially. Its principal products in that field are bare aluminum cable and ACSR (aluminum covered steel reinforced). ACSR is a bare aluminum cable with a steel core primarily used by utilities in the overhead transmission of electric current. Alcoa's share in ACSR and bare aluminum cable declined from 48.4% in 1954 to 32.5% in 1958 and to 26.1% in 1961. Its second principal product is known as aluminum conductor wire and cable. Its share in that product declined from 42.8% in 1954 to 27.8% in 1958 and to 23.5% in 1961. The decline in the above market percentages is reasonably consistent between the dates

above mentioned and continuing since the acquisition. Alcoa's third such product is known as aluminum wire and cable, insulated or covered. Its share in that item varied from 10% in 1954 to 11.6% in 1958 and to 7.3% in 1961. The comparatively recent increase in demand for covered or insulated aluminum conductor wire found Alcoa in an unfavorable market position. It manufactured line wire and multiplex cable with an polyethylene insulation or covering but it lacked the know-how and the facilities for the manufacture of the more complicated line of insulated aluminum wire and cable products.

In March 1952 Alcoa and Rome entered into a continuing agreement referred to as a "tolling agreement" whereby Rome would cover or insulate bare aluminum wire with the more complicated insulated constructions. This arrangement broadened the scope of Alcoa's ability to provide insulated wire products to its trade.

As already indicated, Rome was primarily the manufacturer of copper products, including wire and cable. It has been successful in its manufacturing efforts and expanded same so that at the time of its acquisition it had plants at Rome, New York; Torrance, California; and Collegeville, Pennsylvania. It maintained an active and efficient research department and sales organization. Prior to its acquisition by Alcoa, Rome was one of the ten largest manufacturers of copper conductor wire and cable in the United States. In 1952, Rome installed equipment for the manufacture of aluminum rod from aluminum ingot purchased from primary producers. It began producing such rod for its own use in 1953. Thereafter it began to manufacture and sell certain types of aluminum wire in addition to its broad line of copper products. In the course of its experience and research, Rome developed a special aptitude or skill in the matter of insulating wire and cable. It manufactured a relatively full line of the more complicated insulated wire and cable, designed and built to meet customers' requirements. This skill prompted the so-called "tolling arrangement" between Alcoa and Rome, referred to above.

At the time of the merger, here under consideration, only five products were manufactured and sold by both Alcoa and Rome and their direct competition in the market was limited thereto. These products may be identified as follows—(1) ACSR and bare aluminum cable; (2) covered line wire or weather-proof; (3) multiplex cable; (4) conduit; (5) aluminum redraw rod. The market shares of Rome and Alcoa in these competitive products, generally speaking, were not great and a further discussion of same may better be considered in the discussion of the impact of the merger upon or within the competitive market.

█ In this type of action, a burden is imposed upon the plaintiff to establish three essential elements, listed below, in order to establish a violation of the statute. (1) The relevant products markets or "lines of commerce"; (2) the geographic markets within which the impact of the merger may be measured as to each such line of commerce; and (3) the substantial lessening of competition or tendency to create a monopoly in any such line of commerce in the relevant geographic area. The proof as to these elements will be discussed in the order in which they are mentioned above.

## LINES OF COMMERCE

The Government offers proof as to ten lines of commerce and contends that each has been established thereby as applicable in this action. The defendants agree that four such lines of commerce are appropriate and disputes the relevancy of the remaining six lines and the sufficiency of the proof to establish same. There is set out below the list of specific products as contended by plaintiff, showing which are agreed upon and those in dispute. The position in which they appear below follows the order of the proof and the order in which they are discussed in the submitted briefs.

| | | | |
|---|---|---|---|
| Item | 1. | Aluminum conductor wire and cable. | In issue. |
| " | 2. | Bare aluminum cable and ACSR. | Agreed. |
| " | 3. | Insulated or covered aluminum wire and cable. | In issue. |
| " | 4. | Aluminum ingot and rod used in the production of aluminum conductor wire and cable. | In issue. |
| " | 5. | Conductor wire and cable (aluminum and copper). | Agreed. |
| " | 6. | Conductor wire and cable, bare (aluminum and copper). | In issue. |
| " | 7. | Wire and cable, insulated and covered (aluminum and copper). | Agreed. |
| " | 8. | Service drop cable (aluminum and copper). | In issue. |
| " | 9. | Conduit (aluminum and steel). | Agreed. |
| " | 10. | Aluminum conduit. | In issue. |

———◆———

The Government relies in its brief upon the peculiar characteristics and uses test as the bases upon which a finding of the relevant lines of commerce may rest. This test may find support in such decisions as A. G. Spalding & Bros. Inc. v. F. T. C., 3 Cir., 301 F.2d 585; Crown Zellerbach v. Federal Trade Commission, 296 F.2d 800 and United States v. Bethlehem Steel Corp., D.C., 168 F.Supp. 576 but by the decision in the Brown Shoe case, such test is but one of seven of the "practical indicia" which may serve as a guide in determining submarket lines. Even if so used, such characteristics and uses must be such as to render the product "generally non-competitive".

The consideration and determination of the lines of commerce issue is made having in mind the discussion of the problem in the Brown Shoe case and the rules or guides laid down therein and referred to above.

Items 1, 2 and 3 are generally referred to herein as the aluminum conductor lines and are so related as to be discussed together.

Since Item 1 is a rather broad line and is simply a combination of Items 2 and 3, the latter two should first be determined. Item 2, bare aluminum cable and ACSR, is a heavy cable product which has practically displaced copper for use in overhead transmission lines. It is agreed that same constitutes a line of commerce here.

Item 3, insulated or covered aluminum wire and cable, is not a line of commerce because it is not recognized in the industry as a separate economic entity. While differing in some characteristics and preferred uses from its copper counterpart, they both perform the same functions and it is not "generally non-competitive" with copper. The Government's evidence shows in 1959 that insulated copper conductor comprised 22.8% of the gross additions to insulated overhead distribution lines. Both aluminum and copper wire may be produced interchangeably, using the same facilities. Covered aluminum wire has no distinct customers as distinguished from covered copper wire purchasers. Neither has it specialized vendors. Insulated aluminum and copper wire are generally functionally interchangeable. Their purchase and use are likewise principally dictated by economic factors. While aluminum wire and cable is sold at prices generally distinct from copper and does not have the same price sensitivity, these factors do not destroy the conclusion that covered aluminum wire and cable is in actual competition with its copper counterpart and may not be found as a line of commerce herein. A different conclusion would ignore the admonition, "But the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists".

Since Item 1 is a broad line embracing both Items 2 and 3 and Item 3 is held not to be a proper line of commerce, their combination cannot result in a line of commerce. To find that Item 1 is a line of commerce extends the outer boundaries of the market beyond its legal limits because covered copper wire and cable is interchangeable in use and there is cross-elasticity of the demand therefor between insulated or covered aluminum and copper. To constitute a proper line of commerce, same must include the substitutes therefor which are reasonably interchangeable in use and for which there is a cross-elasticity of demand.

The above conclusion is fortified by the inconsistent position taken by the Government, at least as far as the vertical aspect of the merger is involved. The plaintiff contends here that insulated aluminum wire and cable is a line of commerce and therefore competitively distinct from insulated copper but agrees as to Item 7 that insulated aluminum and insulated copper constitute a single line of commerce.

Item 4, aluminum ingot and rod, used in the production of aluminum conductor wire and cable is simply a grade of aluminum generally referred to as E.C. (electrical conductor). It is but one of 173 recognized aluminum alloys which may be manufactured interchangeably at the will of the producer. All six integrated primary aluminum producers produce various of such alloys including aluminum of E.C. grade which is required by industry standards to contain a minimum aluminum content of 99.45%. Generally the standard is met by the addition of a small percentage of boron to "a high purity pig". The purifying boron however may be added to the ingot during the course of the fabricating process. The rod represents a further product in the reduction of the ingot to the desired wire or cable size. It results from a continuing casting and rolling process and assumes a form or shape which is the starting point for most wire fabricators in their operation.

Although it may be doubtful that ingot and rod of the E.C. grade should be fragmented from the many aluminum alloys, it seems that it satisfies the most of the indicia laid down by the Brown Shoe decision and will be found as a line of commerce in this action.

Items 5, 6, 7 and 8 are generally referred to as conductor lines. They embrace both aluminum and copper wire and cable as distinguished from the four items discussed above which involve aluminum conductor only.

Item 5, conductor wire and cable (aluminum and copper), is a broad line covering all such products whether bare or insulated. Both litigants have agreed that same, together with Item 7, wire and cable, insulated and covered, (aluminum and copper) may also be considered as a line of commerce here.

The first dispute arises when the defendants contend that the broad line, referred to above, may not be broken down by separating therefrom, as a separate line, Item 6, conductor wire and cable, bare. The court adopts such contention and holds that Item 6 does not constitute a proper line of commerce. Such a grouping would include bare aluminum wire and cable and ACSR. The Government has already asserted and agreed that such products are not competitive with copper or interchangeable therewith. In fact, these products are used in the overhead transmission field to the practical exclusion of copper. Grouping them together in Item 6 does not define a single product market. The Bureau of the Census has established separate product classifications for bare copper and for bare aluminum wire and cable. Because a broad line of commerce may be proper does not mean that it may be broken down into all possible fragments.

The proof as to Item 8, service drop cable (aluminum and copper), asserted by the Government as a line of commerce, is rather confusing. As so urged, it is referred to as multiplex cable and consists of one or more insulated conductors twisted around a cable or uninsulated

conductor. This contention seems to again recognize that insulated aluminum is not competitively distinct from insulated copper wire and cable.

The product is or can be made by any manufacturer equipped to produce insulated wire or cable and is simply a separation of a particular item from the many other insulated products. Its use is primarily to carry electricity from the distribution point of the utility to the home or business place of the user and as secondary distribution lines carrying no more than 600 volts. The most popular type is of triplex construction and same is displacing open wire or weatherproof wire as a more popular product for service drop, especially in new construction. The evidence is inconclusive as to amount of product known as service drop as distinguished from its use for other purposes including secondary distribution. As just indicated, weatherproof wire is still used as a service drop product from the utility pole to the entrance of the user's premises. No reliable data is available as to the extent of such use at the times relevant here. Two other types of cable, known as type "K" and type "SD" are presently used for the above purpose in particular localities. It would seem that to constitute a line of commerce, the substitutes for multiplex cable for secondary distribution use, weatherproof and the two types of cable, referred to above, may not be eliminated from consideration as a part of the service drop product line. Their absence, together with a consideration of the indicia, referred to herein, leaves the proof something less than convincing. If a product line is designated in terms of function, it must include all competitive substitutes accomplishing the same result. The Item is held not to be a relevant line of commerce herein.

### THE GEOGRAPHIC MARKET

The litigants have agreed that in respect to all of the above lines of commerce, whether or not allowed as such herein, the United States as a whole constitutes a section of the country within the contemplation of Section 7 of the Clayton Act.

---

Item 9, conduit (aluminum and steel), has been agreed upon as a line of commerce. This item includes both rigid conduit and electrical metallic tubing (EMT). It is simply a metallic enclosure to protect lines or cables carrying electric current from outside injury or harm.

Controversy again arises in the matter of the Governments contention that the above broad conduit line may be separated by a submarket line of aluminum conduit alone. The contention is based principally on the separate characteristics and uses test. This single test, as indicated above, is not conclusive; in fact it is not applicable where such characteristics and uses do not render it generally non-competitive. Here the great weight of evidence is to the effect that aluminum and steel conduit are in direct and vigorous competition for the consumer trade. They are functionally interchangeable; alternate quotations are frequently sought by consumers and they react or are related in price change to each other. Aluminum conduit, taken alone, fails to meet the majority of the prescribed tests as a separate submarket and the contention of plaintiff that Item 10 is a relevant line of commerce is rejected.

### THE GEOGRAPHIC MARKET

There is no dispute but that the United States as a whole is an appropriate section of the country in which the impact of the merger may be considered as to both steel and aluminum conduit and aluminum conduit alone. The Government claims however that eleven western states (Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington and Wyoming) also constitute an appropriate geographic market for both of the above products. The claim is based upon the fact that the greater portion of Rome's total sales of conduit prior to the merger was made to customers within that area. The above statement is also true as to sales made

after the merger. The evidence fails to show that such sales were made in that area as a particular market. Rome's sales expanded from a six state area to a fourteen state area. The above eleven state area was used because data within same was available for comparison purposes. The evidence shows that freight rates and commercial realities are such that outside or eastern producers can ship conduit within the eleven state area and compete effectively with western producers.

In other words the purchaser within that area can turn for supplies to a producer located in any section of the country. Tampa Electric Co. v. Nashville Co., 365 U.S. 320 at 327, 81 S.Ct. 623, at 627, 628, 5 L.Ed.2d 580. The eleven state area is rejected as a proper geographic market in which to measure the impact of either conduit lines of commerce.

### THE COMPETITIVE EFFECT OF THE ACQUISITION

The competitive effect of the acquisition upon the relevant lines of commerce, referred to above, is not determined in accordance with a rigid formula. Guides are furnished in the Brown Shoe decision and the cases cited therein. Reference will be made to those which seem to be pertinent here and will be applied to all claimed lines of commerce whether or not allowed as above.

### PURPOSE

The "nature and purpose of the arrangement" is referred to as a most important factor and will first be discussed since it necessarily involves the participants' competitive problems and something of the background of the defendants previously referred to herein.

Alcoa was the prime mover in bringing about the acquisition. Its share in the aluminum market had declined as referred to herein. Its return on invested capital had declined from 9.3% in 1950 to 3.7% in 1961. It admittedly lacked the "know-how" to manufacture the more complicated types of insulated wire and cable for which there was a growing de-

mand. Its principal wire and cable product was ACSR and bare aluminum cable. The need for product diversification was apparent. Rome was known to Alcoa as a substantial organization with special competence in the insulating field. The time required to obtain such competence from within its own organization and the expense involved seemed to foreclose such a program. Rome was first approached and negotiations failed. An engineering company was retained to explore the market to obtain an organization which would furnish the "know-how" in the insulated wire and cable field. Negotiations were reopened with Rome and the acquisition followed. Competition between Rome and Alcoa was limited to four wire and cable products. Rome's production thereof was not significant in amount.

All of the above indicates an effort to overcome a market disadvantage rather than to obtain a captive market for its product or to eliminate a competitor. The terms of the contract itself indicate an intention to retain Rome after the acquisition as an active participant in the market which it occupied.

### CONCENTRATION

Another factor deemed important in providing a factual background for weighing the probable effect of the acquisition is the trend toward concentration in the industry involved. The Government contends that such a trend exists insofar as the aluminum conductor lines of commerce are involved. In support of the contention, emphasis is placed upon the fact that the combined shares of the market produced by the five integrated producers is roughly averaged at 80%. This fact loses its significance when it is realized that the production of aluminum and the fabricating of its products were concentrated to the point of a monopoly less than twenty years ago and has undergone a gradual decentralization by the entry of new producers and fabricators since that time.

Alcoa has no history of acquisitions or mergers prior to the acquisition of Rome.

Alcoa acquired equipment or assets of three other corporations but aluminum wire and cable products were not involved therein and same could in no way contribute to a concentration in that industry.

The Government cites the acquisition by Olin-Mathieson of the Southern Electric Corp. in 1957. The acquisition by Kaiser in the same year of the U. S. Rubber Co. plant at Bristol, R. I. and the acquisition of John A. Roeblings' Sons Co. by Reynolds in 1961 as indicating a merger trend. When examined, the facts hardly support such an indication. Olin-Mathieson manufactured no aluminum wire and cable products prior to its acquisition of Southern. U. S. Rubber's market share of said products was 0.8% and Roebling's share was never over 0.1% prior to their acquisition by Kaiser and Reynolds as above. More significantly as indicating lack of competitive impact in the product market referred to is the post-acquisition market shares of the above acquiring and acquired companies which show a decline therein as does the Alcoa-Rome market share.

The market situation as to the two principal aluminum conductor lines of commerce can be summarized by stating that as to ACSR and bare aluminum cable, the number of producers of those products increased from Alcoa, alone, in 1940 to twelve such producers in 1950 which number is practically unchanged to date. There were about four producers of insulated wire and cable in 1951 (although government allotments of aluminum for that purpose were issued to eight) and as of April 1, 1961, there were twenty-nine producers of such products.

EASE OF ENTRY

Closely related to the question of trends of or concentration in the aluminum conductor lines of commerce is the question of the existence of barriers to the entry of additional competitors in that particular branch of the industry. This is sometimes referred to as the "ease of entry".

The facts already stated above demonstrate that no serious impediment or barrier exists which would bar the entry of producers of wire and cable products. This is accounted for principally for the reason that similar techniques and the same machinery with but slight alterations may be used in the production of such copper and aluminum products. The fact that in ten years the number of producers of insulated wire and cable has risen from four to twenty-nine and most of the new entrants came from the ranks of insulated copper conductor producers is indicative that entry into the aluminum conductor field is dictated by the status of the competition rather than being controlled by actual economic barriers. That some companies have ceased making this product is not determinative. "It is competition, not competitors, which the Act protects". The evidence discloses that the withdrawal of certain producers from the production of this item was occasioned by an inability to make a profit and there is no evidence which would indicate that any potential producer has been unable to enter the industry when he thought that a profit could be made therein.

There is no doubt that problems are presented in the matter of the entry of a producer in the ACSR and bare aluminum cable market. The product itself involves specialized techniques and equipment especially in the larger sizes used in the overhead transmission field. In spite of difficulties, there are now twelve such producers, one of whom plans an extension of its facilities. The situation in the industry as to the ease of entry of competitors therein is of course not determinative but is simply another factor to be considered in the appraisal of the problem as a whole.

MARKET SHARES

The market shares which Alcoa and Rome may control by the acquisition is

one of the most important factors to be considered. Since the shares in each line of commerce (whether allowed or not) are discussed in the briefs, they will be set out here and the ultimate conclusions to be drawn therefrom will be found in the detailed findings to be filed in connection with this opinion.

In 1958, the Alcoa and Rome market percentages in the three principal aluminum conductor lines as claimed by plaintiff appear below (top of next column).

|  | Alcoa | Rome |
|---|---|---|
| ACSR and Aluminum Cable, Bare | 32.5 | .3 |
| Aluminum Wire and Cable, Insulated or Covered | 11.6 | 4.7 |
| Aluminum Conductor Wire and Cable | 27.8 | 1.3 |

The decline in the combined market percentages of Alcoa and Rome in the above products appears below, which shows a generally continued decline therein both pre and post-acquisition.

|  | Decline (Percentage Points) | | | | | |
|---|---|---|---|---|---|---|
|  | 1954 | 1958 | 1961 | 1954–58 | 1958–61 | 1954–61 |
| ACSR and Aluminum Cable, Bare | 48.6 | 32.8 | 26.1 | 15.8 | 6.7 | 22.5 |
| Aluminum Wire and Cable, Insulated or Covered | 16.9 | 16.3 | 13. | .6 | 3.3 | 3.9 |
| Aluminum Conductor Wire and Cable | 43.9 | 29.1 | 24.8 | 14.8 | 4.3 | 19.1 |

In 1958 the market percentage of Alcoa and Rome in the four conductor (aluminum and copper) lines of commerce are set out below.

|  | Alcoa | Rome |
|---|---|---|
| Conductor Wire and Cable | 1.8 | 1.4 |
| Conductor Wire and Cable, Bare | 10.3 | 2. |
| Wire and Cable, Insulated or Covered | .3 | 1.3 |
| Service Drop | 10.8 | 5.1 |

The plaintiff contends that the above percentage table should be increased by the shipments of conductor wire and cable made by the Rea Magnet Wire Co. for 1958. This company was acquired by Alcoa in 1960. Same would seem unimportant from a competitive standpoint since its product was entirely copper wire of small size used principally in coils, transformers, etc. It made no product which competed with Rome. If such products were added, it would increase the total of Alcoa and Rome by 1.1% for conductor wire and cable and 1.3% for wire and cable, insulated, and actually add little or nothing to the significance of the percentages involved.

There is no evidence that the market shares in the conductor lines of commerce have increased or diminished since the acquisition. It would be speculative to assume that the percentages have changed appreciably except perhaps in the case of service drop which is composed principally of aluminum as the conductor and would seem to be included within the insulated or covered aluminum wire line and therefore subject to the post-acquisition decline therein.

In the conduit lines of commerce, no probative pre-acquisition market data is available. At that time, Alcoa made only aluminum conduit while Rome made only

steel conduit. Based upon a survey first made about 1960, Alcoa's share in the conduit market (aluminum and steel) was 3.4% and Rome's share was 3.5%. In aluminum conduit alone, the survey shows that in 1960 Alcoa's market share was 12.0% and Rome's as agent for Alcoa was 14.5%. These later figures should not be construed as showing that Rome in the post-acquisition period actually manufactured aluminum conduit. It had no extruding facilities. The above percentage apparently represents sales of aluminum conduit completely manufactured by Alcoa but sold by Rome as its agent and conduit pipe produced by Alcoa and threaded at the California plant of Rome. The accuracy of the above market shares is seriously questioned by defendants which, together with their incompleteness, afford little, if any, basis for a finding of the effect of the acquisition upon competition in either of the alleged lines of commerce whether or not allowed as such.

The market shares of the defendants in aluminum ingot and rod line of commerce appear to be inconclusive. Rome was not a producer of primary aluminum and did not compete in that market. Rome's purchase of primary aluminum amounted to .2% of the total industry production and .3% of Alcoa's production. Rome manufactured its own rod and additionally sold a small amount thereof for conductor use to non-integrated producers of wire and cable. Percentagewise, such sales amounted to a fraction of one percent of the market.

INDUSTRY EVIDENCE

In Brown Shoe, as in several other reported decisions, industry evidence as to the actual or potential effect of the acquisition upon suppliers and purchasers has been considered as a factor in determining the effect of the acquisition upon suppliers and purchasers. There is an entire absence of such evidence on the part of the Government. The passage of almost three years from the time of acquisition to the time of trial would seem to bring to light the anti-competitive effect of same if in fact it existed.

Evidence to the contrary appears in the record. The defendants, through some eight or more witnesses, actively engaged in the aluminum wire and cable industry—all testified without exception that the acquisition has not had an adverse effect upon the purchasers of such products. No difficulty has been encountered in expanding their list of suppliers and that competition among such suppliers has not been affected.

THE DOMINANT POSITION OF ALCOA

Throughout the trial and in the submitted briefs, the Government has taken the position that Alcoa occupies a dominant position in the production of primary aluminum and in the manufacture of aluminum conductor wire and cable products. It is urged that this acquisition has enhanced that position and is therefore a factor in determining the competitive effects thereof. So much reliance is placed thereon that a brief discussion would seem appropriate.

■ Undoubtedly Alcoa is large in size, both physically and financially. Its activities are varied and extensive. Care however must be taken not to exaggerate its influence because of its size alone, especially in the absence of evidence of the abuse of the power which goes with size. United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343; United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. The mere intrusion of "bigness" into a competitive market will not in itself violate the statute. Reynolds Metals Co. v. F.T.C., D.C.Cir., 309 F.2d 223 at 230. Here the Government's contention as to the dominance of Alcoa appears to rest upon size alone without evidence as to the exercise of the power that goes with it. In 1957, Judge Cashin in United States v. Aluminum Company of America, D.C., 153 F.Supp. 132 at 167 found as a fact that Alcoa's relative share of the aluminum market had declined at that time. That such decline has continued to date appears without contradiction in this case. An increase in the

money value of products sold means nothing in the light of the increase in the total market and the decline in the rate of return on Alcoa's invested capital. The increase in the number and market shares of primary aluminum producers and wire and cable producers all point to the conclusion that Alcoa's position in the above markets is something less than dominant. In any event, if Alcoa has the power to dominate, the record fails to show that such power has been used to its own advantage. The position of Alcoa in the above mentioned markets is relevant in this proceeding as a part of the overall picture upon which the decision must be based but this court sees nothing therein from which it could find that such position and the use thereof are indicative of forbidden anti-competitive practices.

## THE COMPETITIVE IMPACT

In appraising the impact of the acquisition, we turn first to the relationship between Alcoa and Rome as a source of supply and as direct competitors.

The customer-supplier relationship, referred to as the vertical aspect, requires little comment. Rome's purchase from Alcoa of primary aluminum was about 3/10 of one percent of Alcoa's production of that product. This small amount is without significance from a competitive standpoint but indicates rather clearly that the acquisition did not involve the purchase by Alcoa of a captive market.

The market area in which both the acquiring and acquired companies manufactured and sold competing products was limited to four or five items previously mentioned herein. The combination of the manufacturing and selling facilities of the two companies on these items involves the horizontal aspect of the acquisition in its actual and probable effects upon competition.

In ACSR and bare aluminum cable, Rome's pre-acquisition share of the market was 0.3%. In fact, Rome competed only in the smaller sizes of the product while Alcoa manufactured and sold a full line thereof. The products known as covered line wire or weatherproof and multiplex cable may be discussed together. These products have many end uses but are limited here to "service drop" which has been rejected as a line of commerce. In 1958, Alcoa's share in the service drop market, according to the figures of the Census of Manufactures was 10.8% and Rome's was 5.1%. These figures do not however include the product known as weatherproof wire, also used as service drop, which was reported under a different classification. Pre-acquisition figures are not available as to the market shares of the defendants in the product known as conduit. During the above time period, Rome manufactured steel conduit, both rigid and thin or electrical metallic tubing (E.M.T.). Alcoa manufactured rigid aluminum conduit and aluminum E.M.T. so that competition between them was in effect the competition between steel and aluminum. The nature and extent of the inter-defendant competition, resulting from the above, may be gathered from the discussion of the market shares of the defendants in the conduit lines of commerce as contained herein and needs no repetition here. The same may be said of the item of redraw rod. The extent of the competition therein may also be gathered from the brief discussion herein of market shares of defendants in that item.

Considered only from the manufacturing level, the comparatively small percentages of the market which Rome held in the overlap or competing products would not alone condemn the acquisition especially in view of the purpose and the other relevant factors previously discussed.

The principal contention urged as violative of the statute arises from the premise that the integrated producers are involved in a struggle for monopoly power with the non-integrated producers as their opponents. The argument proceeds to the conclusion that the acquisition adds to the numerical and market strength of the integrated companies especially in the

aluminum lines of commerce and is therefore to be condemned.

Without doubt, an integrated company enjoys advantages over its non-integrated competitor. Such advantages would include the ability to sell intermediate products as well as end or fabricated products. Thus at least two opportunities to make a profit are available. They are able to offer a broader line of products to the trade and their sales organizations are likewise given more latitude and sales techniques extended. These advantages are not necessarily conducive to competitive strength in the lines of commerce involved. The financial outlay required, the obtaining and holding of the required skills, the constant research and experimentation, which are required of the seller of intermediate products, are burdens which the fabricator avoids but the integrated producer must carry.

The arraying of the integrated companies on one side and the non-integrated companies on the other overlooks entirely the active and vigorous competition among the integrated companies. In Alcoa's analysis of its lost business from 1957 to 1959, it appears that the larger portion of same was lost to integrated producers. Its loss of business to Rome during the same period was insignificant. Previous government action was designed to facilitate the entry of manufacturing competitors of Alcoa's products. Now that such competitors have come into existence, the realities of competition dictate that same may not be ignored or distorted in appraising the competitive market as a whole.

Plaintiff presents statistics tending to show that the market shares of the integrated companies in the aluminum conductor lines of commerce have increased from 1955 to 1959 while the shares of the non-integrated companies have decreased during the same period. This is accounted for principally by the addition of Anaconda and Olin-Mathieson (Ormet) to the list of integrated producers. More significant however is the fact that since the acquisition and up to 1961, the non-integrated companies have held or increased their market shares in the lines under discussion while the shares of the Alcoa-Rome combination have declined. In the ACSR and bare aluminum cable and aluminum conductor wire and cable lines, the non-integrated producers have retained their shares of the market, while the share of Alcoa-Rome in ACSR has dropped from 32.8% to 26.1%. In aluminum conductor, the non-integrated producers have retained their market shares while the share of Alcoa has decreased from 29.1% to 24.8%. In the insulated or covered line of commerce, the non-integrated producers market share has increased from 29.8% to 33.5% while the share of Alcoa-Rome has declined from 16.3% to 13.0%.

The above is proof of what has actually happened in the competitive market. It is a competitive reality much more convincing than arguments based upon speculative future market conditions. When such facts are supported by the oral testimony of utility purchasing agents and non-integrated manufacturers to the effect that the acquisition has not adversely affected their businesses, a finding of a substantial lessening of competition is precluded. The fact that some four or five non-integrated producers have reduced or abandoned their aluminum conductor wire business since 1956 is offset by the entry of at least one new company and increase in their productive facilities by four others. The reduction in or abandonment of the manufacturing of these products were brought about principally by an inability to make a profit therein. This situation tends to confirm rather than to negate the existence of a vigorous competition in the products involved.

The plaintiff advances the argument that the acquisition has eliminated the "potential competition" which would have existed if Rome and Alcoa had separately expanded their facilities so as to include additional aluminum products or increased the production of the overlapping competing products. Like many

business concerns, the defendants undoubtedly were constantly reviewing their product lines and exploring the possibilities of expansion. There is no evidence however that either had reached a firm conclusion that such an expansion had or would meet with the necessary approval of those in authority. Expansion from within rather than by acquisition may be preferable from the economist's point of view but the statute makes no such prohibition. The substantial lessening of competition, either actual or probable, is the test.

Considerable discussion is found in plaintiff's brief to the effect that this acquisition increased the problem of a "price squeeze" by the integrated producers or by Alcoa in particular. The discussion proceeds upon the theory that the price of primary aluminum to the fabricators may be so increased that they will be unable to make a profit from sale of the end products. This court does not understand just how the acquisition could affect the problem. Rome was not a primary aluminum producer and its acquisition by Alcoa did not affect either the production or price of that product. Certainly the fabricator would like to buy his basic material as cheap as possible. This contention ignores the competition between primary aluminum producers and seems to assume without evidence to support it that such producers will abandon by an unconscionable pricing arrangement the market for primary aluminum and be content to sell only the end product. This overlooks entirely the present competitive situation among primary aluminum producers, the government required allotment of primary aluminum, and the availability of Canadian and foreign intermediate aluminum products. The argument is purely speculative and without evidence to support it.

Although the above discussion applies particularly to the three alleged aluminum conductor lines of commerce, the factors considered would also apply to aluminum ingot and rod used in the production of aluminum conductor wire and cable and to service drop cable which are urged as proper lines of commerce here by the plaintiff. No separate discussion of the competitive effect of the acquisition upon those two lines of commerce is necessary. While service drop is made with either an aluminum or copper conductor, the aluminum type presently predominates. The ease of entry into the business of manufacturing of service drop and the evidence that the Alcoa-Rome share of the market in insulated or covered aluminum conductor, which includes aluminum conductor service drop, has diminished since the acquisition, in particular prompts the conclusion that the acquisition does not violate the statute insofar as the service drop and aluminum ingot may be involved.

The competitive effect of the acquisition in the three principal conductor (aluminum and copper) lines of commerce is not particularly stressed in the plaintiff's briefs or argument. The market shares of Aloca and Rome therein are not impressive. Alcoa's higher percentage of the market in conductor wire and cable, bare, is made up of ACSR and bare aluminum cable which comprises all but one-tenth of one percent of its market share. Rome's share in the same item (lacking one-tenth of one percent) is made up of bare conductor copper wire and cable which are not competitive with ACSR as indicated in the discussion of ACSR as an appropriate line of commerce. There is no evidence of post-acquisition trends in the lines now considered. Likewise there is no evidence that the market, broadened by the inclusion of the competition afforded by the over two-hundred wire and cable producers (both aluminum and copper), will suffer actual or probable anti-competitive effects. There is evidence that such market comprises many strong and vigorous competitors. Alcoa obtained by the acquisition a diversification of its product line by the addition of Rome's copper wire and cable products. Rome however remains as the same source of supply of

such products. Considering the same factors discussed herein and applying same to the items presently referred to leads to the conclusion that the statute is not violated as to the three conductor lines of commerce referred to above.

The approach to the consideration of the competitive effect of acquisition upon the conduit lines of commerce is handicapped by the absence of reliable market data. The Brown Shoe case opinion, in referring to the Congressional intent, uses the language "demonstrable anticompetitive effects" as the type of mergers to be invalidated by the statute. Prior to the acquisition, Alcoa manufactured only aluminum conduit, Rome only steel. We have no evidence of the pre-acquisition share of either company in the market. We do have a hesitating and inconclusive estimate of Rome sales in the eleven western states which is rejected as a proper geographic market. The available post-acquisition data lacks the reliability upon which a demonstrable anticompetitive effect may rest. In 1960, the Bureau of the Census compiled figures that defendants' market share of conduit, both steel and aluminum, was 6.9%. This percentage was allocated 3.4% to Alcoa and 3.5% to Rome. The same report attributes the defendants' combined share of aluminum conduit at 26.5% The above was the first such survey made by the Bureau and forms for same were sent only to those who designated themselves as producers of conduit in 1958 and 1959. The evidence shows that at least three aluminum producers entered the conduit field in the 1958–1960 time period.

Again plaintiff appears to stress the status of the defendants in the aluminum conduit line as having anticompetitive effects. Although aluminum conduit has been rejected as a relevant line of commerce here, brief comment will be made relative thereto. Entry to the aluminum conduit market requires only an outlay of ten to fifteen thousand dollars by those producers owning extruding equipment. In 1950, there were fifty such owners. The number increased to one hundred and ten in 1955 and to one hundred thirty-three in 1960. The ease of entry is further corroborated by the substantial number of new producers of aluminum conduit in recent years. This is due to the increased demand for the product and provides an active competitive market therein. There is a failure of proof to show that the statute is violated by the acquisition as to either of the conduit lines of commerce as claimed by the plaintiff.

Using the pragmatic practical approach, an appraisal of the acquisition here involved designates same as the combination of an aluminum and an essentially copper manufacturing company. Such an acquisition implies advantages to the acquiring company. Such advantages are not to be condemned unless they portend or approach monopoly proportions. It is the loss to competition rather than the advantage gained that invokes the statute here. Alcoa gained an increase in its scientific knowledge and ability in insulating techniques and a diversification of its line of salable products. This would seem to be a legitimate end in the face of its declining market. There is less need than usual to speculate here upon the effect of the acquisition upon competition. Not only do we have industry evidence as to the actual effect from competitors and purchasers but we also have the factual results of almost three years of market experience. After consideration of all of the evidence offered herein, it is concluded that the acquisition by Alcoa of the capital stock of Rome has not been shown to be in violation of Section 7 of the Clayton Act; that the claim of the complaint has not been established and that same should be dismissed.

This opinion, together with the Findings of Fact and Conclusions of Law, to be filed herewith, will constitute the Findings and Conclusions of this court and judgment is directed accordingly.

SO ORDERED.