Mr. Justice Stewart,
whom Mr. Justice Harlan and Mr. Justice Goldberg join,
dissenting.
In this civil action, brought under § 7 of the Clayton Act, as amended, the District Court found that the Government had failed to sustain its burden of proof as to both the “line of commerce” and competitive effect issues. Because I think the Government clearly failed to prove its “line of commerce” claims, I dissent from today’s reversal of the trial court’s judgment.
*414 A four-week trial was held — after 22 months of extensive pretrial discovery. Five hundred documentary exhibits were received in evidence, and 50 witnesses were heard. The record amounts to more than 3,500 pages. The district judge wrote a long and careful opinion, accompanied by meticulous findings of fact and thoroughly reasoned conclusions of law. In determining the relevant lines of commerce involved here, the trial judge conscientiously applied the standards postulated by this Court in Brown Shoe Co. v. United States, 370 U. S. 294, 325, and made detailed findings of fact fully supporting his determinations. 214 F. Supp. 501. The Government has not claimed that any of these findings of fact are clearly erroneous, nor does the Court today hold them to be. Nevertheless, the Court reverses the judgment. I find it difficult to understand the Court's conclusion, and impossible to agree with it.
A “[djetermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act.” United States v. E. I. du Pont de Nemours & Co., 353 U. S. 586, 593. In order to prove that this was a horizontal merger in violation of § 7, the Government was therefore faced with the necessity of showing substantial percentages of market shares in competitive products.[1] Alcoa manufactured no copper cable, and in the conductor field was chiefly a producer of bare aluminum cable. Over 90% of Rome’s production was in insulated copper products, and its production of bare aluminum cable was de minimis (.3% of the market share). ' The District Court found that conductor wire and cable (both bare and insulated, aluminum and copper), and insulated conductor (both aluminum and copper), were lines of commerce, but that Alcoa’s and Rome’s market shares in these broad product markets were insufficient to support a find *415 ing of requisite anticompetitive effect, 214 F. Supp., at 518-519 — a conclusion which the Government does not question here. More substantial market share percentages would be forthcoming, however, if aluminum conductors could be set apart from the rest of the conductor manufacturing industry. Accordingly, the Government asked the District Court to find aluminum conductors in general, and insulated aluminum conductors in particular, to be separate lines of commerce.
The District Court declined to make such a finding, and for good reason. A line of commerce is an “area of effective competition,” to be determined in accordance with the principles laid down in our prior decisions. In Brown Shoe, this Court held that there are broad product markets within which there may be “well-defined” and “economically significant” submarkets. 370 U. S., at 325. The Court in that case did not attempt to formulate any rigid standard for determining submarket boundaries, but indicated that a broad-ranging pragmatic evaluation of market realities was required. The federal trial courts were admonished to examine “such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product’s peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.” Ibid. These “practical indicia” to be considered in determining submarket boundaries express in practical terms the basic economic concept that markets are to be defined in terms of the close substitutability of either product (demand) or production facilities (supply), since it is ultimately the degree of substitutability that limits the exercise of market power, and it is only by delimiting the area of effective competition that an acquisition’s competitive effects can be ascertained.
*416 The District Court applied these practical indicia with meticulous care, and found that the conductor industry-does not differentiate between copper and aluminum insulated products; that copper and aluminum products are functionally interchangeable; and that there are no unique production facilities, distinct customers or specialized vendors for insulated aluminum conductor products. 214 F. Supp., at 509. The trial judge did not, as the Court implies, ignore the fact that the prices of copper and aluminum insulated products are generally distinct. It explicitly recognized this fact, but concluded on closer examination of the industry that this price difference did not foreclose “actual competition.” Ibid. Accordingly, making a practical judgment based on the Brown Shoe submarket indicia, the District Court concluded that insulated aluminum conductor had not been established as a line of commerce. And since the other alleged line of commerce — aluminum conductor generally — was no more than the sum of bare and insulated aluminum conductors, the court concluded that it, too, could not constitute an “area of effective competition,” since as to the insulated segment, important competitive copper elements would be improperly and arbitrarily excluded. Id., at 510.
The District Court, in other words, did a careful and thoughtful job. It applied the proper law, and its reasoning was impeccable. Yet this Court overrules its decision with little more than a wave of the hand. On the basis of two assertions, that the record shows “fabricators of insulated copper conductor are powerless to éliminate the price disadvantage under which they labor and thus can do little to make their product competitive,” and that the difference in price between aluminum and copper conductors is “the single, most important, practical factor in the business,” both of which are contrary to the explicit findings of the District Court, the Court summarily con- *417 eludes that aluminum conductor is “for purposes of § 7 a 'line of commerce.' ”
The District Court found that neither insulated aluminum nor insulated copper conductor products are recognized as a separate economic entity. Insulated products are identified and defined by the industry and reported to the Bureau of the Census in accordance with their function or type, “not according to the metal used as conductor,” and manufacturers regard themselves simply as insulators of wire and cable products. Moreover, there is complete manufacturing interchangeability between copper and aluminum, and manufacturers constantly review their product lines and “switch readily from one product or conductor metal to another in accordance with market conditions.” As a result, if a fabricator should feel himself at a competitive disadvantage because of his use of copper, he is not, as the Court asserts, powerless to eliminate a price disadvantage. The supply flexibility which this implies exerts a profound restraint upon an aluminum cable manufacturer’s power to achieve any sort of market advantage.
The Court points to nothing in the record justifying its second assertion that “price . . . is . . . the single, most important, practical factor in the business.” Whether it is or not is a matter of fact, and the trial judge found upon substantial evidence that “[s]ince copper and aluminum products are completely interchangeable from a performance standpoint, utility companies choose between copper and aluminum insulated or covered overhead products solely on the basis of economics. The decision requires evaluation of numerous economic factors in addition to the cost of the wire or cable itself.” (Emphasis supplied.) The record amply supports this finding. There was undisputed testimony that in some situations, the final installed cost of aluminum conductor may be greater than its copper counterpart because of other economic factors *418 such as the higher cost of connectors which must be used with aluminum and the fact that the copper-aluminum cost difference becomes less significant the more complex the conductor required for the job. That the copper-aluminum price difference is not always the determining factor is further borne out by other findings of the trial judge, fully supported by the record, that even in areas where aluminum has gained “increasing use,” there is a “lively competition between aluminum and copper products” ; that the aluminum-copper price difference does not foreclose “actual competition” and that, in fact, “substantial quantities” of the copper version of overhead distribution products are sold.
But even if insulated aluminum conductor is a proper line of commerce, there is no basis in logic, or in the competitive realities of the conductor industry, for lumping together in one line of commerce bare and insulated aluminum conductors. Even the Government does not claim that the two are competitive,- different equipment and engineering skills are required for their manufacture and sale; and, as the District Court found, the combination of bare and insulated aluminum conductors is not generally “recognized in the industry as a separate economic entity” or submarket. The grouping of bare and insulated aluminum conductors into one line of commerce, therefore, is not, as the Court says, “a logical extension of the District Court’s findings,” [2] but a repudiation of those findings. And it adds nothing to note, as the Court does, that both bare and insulated aluminum conductors are used to conduct electricity and are sold to electrical utilities. All electrical conductors are used for this purpose and sold to these customers. Such a non-sequitur cannot justify the separation of aluminum conductors from the rest of the electrical conductor field.
*419 The short of it is, there is here no relevant market upon which to predicate a violation of § 7. The District Court correctly described this acquisition as “the combination of an aluminum and an essentially copper manufacturing company,” undertaken by Alcoa “in the face of its declining market,” for the purpose of obtaining insulating know-how and diversification needed “to overcome a market disadvantage rather than to obtain a captive market ... or to eliminate a competitor.” 214 F. Supp., at 512. I am totally unable to join the Court in its ipse dixit transformation of this essentially “know-how” acquisition into a horizontal merger in violation of § 7.
I would affirm the judgment of the District Court.

 See United States v. Philadelphia Bank, 374 U. S. 321.

 See note 4 of the Court’s opinion.