377 U.S. 271 (1964)
UNITED STATES
v.
ALUMINUM CO. OF AMERICA ET AL.
No. 204.
Supreme Court of United States.
Argued April 23, 1964.
Decided June 1, 1964.
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK.
*272 Solicitor General Cox argued the cause for the United States. With him on the brief were Assistant Attorney General Orrick, Frank Goodman, Robert B. Hummel, Donald F. Melchior, Charles D. Mahaffie, Jr. and Richard J. Wertheimer.
Herbert A. Bergson argued the cause for appellees. With him on the brief were Howard Adler, Jr., Hugh Latimer and William K. Unverzagt.
MR. JUSTICE DOUGLAS delivered the opinion of the Court.
The question is whether the 1959 acquisition by the Aluminum Company of America (Alcoa) of the stock and assets of the Rome Cable Corporation (Rome) "may *273 be substantially to lessen competition, or to tend to create a monopoly" in the production and sale of various wire and cable products and accessories within the meaning of § 7 of the Clayton Act.[1] The United States, claiming that § 7 had been violated, instituted this civil suit and prayed for divestiture. The District Court, after a trial, held that there was no violation and dismissed the complaint. 214 F. Supp. 501. The case is here on appeal, 15 U. S. C. § 29; and we noted probable jurisdiction. 375 U. S. 808.

I.
The initial question concerns the identification of the "line of commerce," as the term is used in § 7.
Aluminum wire and cable (aluminum conductor) is a composite of bare aluminum wire and cable (bare aluminum conductor) and insulated or covered wire and cable (insulated aluminum conductor). These products are designed almost exclusively for use by electric utilities in carrying electric power from generating plants to consumers throughout the country. Copper conductor wire and cable (copper conductor) is the only other product utilized commercially for the same general purpose. Rome produced both copper conductor and aluminum conductor. In 1958the year prior to the mergerit produced 0.3% of total industry production of bare aluminum *274 conductor, 4.7% of insulated aluminum conductor, and 1.3% of the broader aluminum conductor line.
Alcoa produced no copper conductor. In 1958 it produced 32.5% of the bare aluminum conductor, 11.6% of insulated aluminum conductor, and 27.8% of aluminum conductor.
These products, as noted, are most often used by operating electrical utilities. Transmission and distribution lines[2] are usually strung above ground, except in heavily congested areas, such as city centers, where they are run underground. Overhead, where the lines are bare or not heavily insulated, aluminum has virtually displaced copper, except in seacoast areas, as shown by the following table:

Percent of Aluminum Conductor in Gross Additions to Overhead Utility Lines.

 1950 1955 1959
Transmission Lines (All Bare Conductor)... 74.4% 91.0% 94.4%
Distribution Lines:
 Bare Conductor......................... 35.5 64.4 79.0
 Insulated Conductor.................... 6.5 51.6 77.2
Total, Transmission and Distribution Lines.. 25.0 60.9 80.1

Underground, where the conductor must be heavily insulated, copper is virtually the only conductor used. In sum, while aluminum conductor dominates the overhead field, copper remains virtually unrivaled in all other conductor applications.
The parties agree, and the District Court found, that bare aluminum conductor is a separate line of commerce. The District Court, however, denied that status to the broader aluminum conductor line because it found that insulated aluminum conductor is not an appropriate line *275 of commerce separate and distinct from its copper counterpart. The court said the broad product group cannot result in a line of commerce, since a line of commerce cannot be composed of two parts, one of which independently qualifies as a line of commerce and one of which does not.
Admittedly, there is competition between insulated aluminum conductor and its copper counterpart, as the District Court found. Thus in 1959 insulated copper conductor comprised 22.8% of the gross additions to insulated overhead distribution lines. This is enough to justify grouping aluminum and copper conductors together in a single product market. Yet we conclude, contrary to the District Court, that that degree of competitiveness does not preclude their division for purposes of § 7 into separate submarkets, just as the existence of broad product markets in Brown Shoe Co. v. United States, 370 U. S. 294, did not preclude lesser submarkets.[3]
Insulated aluminum conductor is so intrinsically inferior to insulated copper conductor that in most applications it has little consumer acceptance. But in the field of overhead distribution it enjoys decisive advantagesits share of total annual installations increasing from 6.5% in 1950 to 77.2% in 1959. In the field of overhead distribution the competition of copper is rapidly decreasing. As the record shows, utilizing a high-cost metal, fabricators of insulated *276 copper conductor are powerless to eliminate the price disadvantage under which they labor and thus can do little to make their product competitive, unless they enter the aluminum field. The price of most insulated aluminum conductors is indeed only 50% to 65% of the price of their copper counterparts; and the comparative installed costs are also generally less. As the District Court found, aluminum and copper conductor prices do not respond to one another.
Separation of insulated aluminum conductor from insulated copper conductor and placing it in another submarket is, therefore, proper. It is not inseparable from its copper equivalent though the class of customers is the same. The choice between copper and aluminum for overhead distribution does not usually turn on the quality of the respective products, for each does the job equally well. The vital factors are economic considerations. It is said, however, that we should put price aside and Brown Shoe, supra, is cited as authority. There the contention of the industry was that the District Court had delineated too broadly the relevant submarketsmen's shoes, women's shoes, and children's shoesand should have subdivided them further. It was argued, for example, that men's shoes selling below $8.99 were in a different product market from those selling above $9. We declined to make price, particularly such small price differentials, the determinative factor in that market. A purchaser of shoes buys with an eye to his budget, to style, and to quality as well as to price. But here, where insulated aluminum conductor pricewise stands so distinctly apart, to ignore price in determining the relevant line of commerce is to ignore the single, most important, practical factor in the business.
The combination of bare and insulated aluminum conductor products into one market or line of commerce *277 seems to us proper.[4] Both types are used for the purpose of conducting electricity and are sold to the same customers, electrical utilities. While the copper conductor does compete with aluminum conductor, each has developed distinctive end usesaluminum as an overhead conductor and copper for underground and indoor wiring, applications in which aluminum's brittleness and larger size render it impractical. And, as we have seen, the price differential further sets them apart.
Thus, contrary to the District Court, we conclude (1) that aluminum conductor and copper conductor are separable for the purpose of analyzing the competitive effect of the merger and (2) that aluminum conductor (bare and insulated) is therefore a submarket and for purposes of § 7 a "line of commerce."

II.
Taking aluminum conductor as an appropriate "line of commerce" we conclude that the merger violated § 7.
Alcoa is a leader in markets in which economic power is highly concentrated. Prior to the end of World War II it was the sole producer of primary aluminum and the sole fabricator of aluminum conductor. It was held in 1945 to have monopolized the aluminum industry in violation of § 2 of the Sherman Act. See United States v. Aluminum Co., 148 F. 2d 416. Relief was deferred while the United States disposed of its wartime aluminum facilities *278 under a congressional mandate to establish domestic competition in the aluminum industry.[5] As a result of that policy and further federal financing and assistance, five additional companies entered the primary aluminum field so that by 1960 the primary producers showed the following capacity:

Aluminum Ingot Capacity Existing or Under Construction at the End of 1960.

 [SHORT TONS]
 Company Capacity % of U. S.
Aluminum Company of America.............. 1,025,250 38.6
Reynolds Metals Company.................. 701,000 26.4
Kaiser Aluminum & Chemical Corp.......... 609,500 23.0
Ormet, Inc............................... 180,000 6.8
Harvey Aluminum.......................... 75,000 2.8
Anaconda Aluminum Company................ 65,000 2.4
 United States total................. 2,655,750 100.0

In 1958the year prior to the mergerAlcoa was the leading producer of aluminum conductor, with 27.8% of the market; in bare aluminum conductor, it also led the industry, with 32.5%. Alcoa plus Kaiser controlled 50% of the aluminum conductor market and, with its three leading competitors, more than 76%. Only nine concerns (including Rome with 1.3%) accounted for 95.7% of the output of aluminum conductor. In the narrower market of insulated aluminum conductor, Alcoa was third with 11.6% and Rome was eighth with 4.7%. Five companies controlled 65.4% and four smaller ones, including Rome, added another 22.8%.
In other words, the line of commerce showed highly concentrated markets, dominated by a few companies but *279 served also by a small, though diminishing,[6] group of independents. Such decentralization as has occurred resulted from the establishment of a few new companies through federal intervention, not from normal, competitive decentralizing forces.
The proposition on which the present case turns was stated in United States v. Philadelphia National Bank, 374 U. S. 321, 365, n. 42, as follows:
"It is no answer that, among the three presently largest firms (First Pennsylvania, PNB, and Girard), there will be no increase in concentration. If this argument were valid, then once a market had become unduly concentrated, further concentration would be legally privileged. On the contrary, if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great."
*280 The Committee Reports on § 7 show, as respects the Celler-Kefauver amendments in 1950, that the objective was to prevent accretions of power which "are individually so minute as to make it difficult to use the Sherman Act test against them." S. Rep. No. 1775, 81st Cong., 2d Sess., p. 5. And see H. R. Rep. No. 1191, 81st Cong., 1st Sess., p. 3. As the Court stated in Brown Shoe Co. v. United States, 370 U. S. 294, 323:
"Congress used the words `may be substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act."
See also United States v. Philadelphia National Bank, 374 U. S., at 362, and United States v. El Paso Natural Gas Co., 376 U. S. 651, 658.
The acquisition of Rome added, it is said, only 1.3% to Alcoa's control of the aluminum conductor market. But in this setting that seems to us reasonably likely to produce a substantial lessening of competition within the meaning of § 7. It is the basic premise of that law that competition will be most vital "when there are many sellers, none of which has any significant market share." United States v. Philadelphia National Bank, 374 U. S., at 363. It would seem that the situation in the aluminum industry may be oligopolistic. As that condition develops, the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge. That tendency may well be thwarted by the presence of small but significant competitors. Though percentagewise Rome may have seemed small in the year prior to the merger, it ranked ninth among all companies and fourth *281 among independents in the aluminum conductor market; and in the insulated aluminum field it ranked eighth and fourth respectively. Furthermore, in the aluminum conductor market, no more than a dozen companies could account for as much as 1% of industry production in any one of the five years (1955-1959) for which statistics appear in the record. Rome's competition was therefore substantial. The record shows indeed that Rome was an aggressive competitor. It was a pioneer in aluminum insulation and developed one of the most widely used insulated conductors. Rome had a broad line of high-quality copper wire and cable products in addition to its aluminum conductor business, a special aptitude and skill in insulation, and an active and efficient research and sales organization. The effectiveness of its marketing organization is shown by the fact that after the merger Alcoa made Rome the distributor of its entire conductor line. Preservation of Rome, rather than its absorption by one of the giants, will keep it "as an important competitive factor," to use the words of S. Rep. No. 1775, supra, p. 3. Rome seems to us the prototype of the small independent that Congress aimed to preserve by § 7.
The judgment is reversed and since there must be divestiture, the case is remanded to the District Court for proceedings in conformity with this opinion.
Reversed and remanded.
MR. JUSTICE STEWART, whom MR. JUSTICE HARLAN and MR. JUSTICE GOLDBERG join, dissenting.
In this civil action, brought under § 7 of the Clayton Act, as amended, the District Court found that the Government had failed to sustain its burden of proof as to both the "line of commerce" and competitive effect issues. Because I think the Government clearly failed to prove its "line of commerce" claims, I dissent from today's reversal of the trial court's judgment.
*282 A four-week trial was heldafter 22 months of extensive pretrial discovery. Five hundred documentary exhibits were received in evidence, and 50 witnesses were heard. The record amounts to more than 3,500 Pages. The district judge wrote a long and careful opinion, accompanied by meticulous findings of fact and thoroughly reasoned conclusions of law. In determining the relevant lines of commerce involved here, the trial judge conscientiously applied the standards postulated by this Court in Brown Shoe Co. v. United States, 370 U. S. 294, 325, and made detailed findings of fact fully supporting his determinations. 214 F. Supp. 501. The Government has not claimed that any of these findings of fact are clearly erroneous, nor does the Court today hold them to be. Nevertheless, the Court reverses the judgment. I find it difficult to understand the Court's conclusion, and impossible to agree with it.
A "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act." United States v. E. I. du Pont de Nemours & Co., 353 U. S. 586, 593. In order to prove that this was a horizontal merger in violation of § 7, the Government was therefore faced with the necessity of showing substantial percentages of market shares in competitive products.[1] Alcoa manufactured no copper cable, and in the conductor field was chiefly a producer of bare aluminum cable. Over 90% of Rome's production was in insulated copper products, and its production of bare aluminum cable was de minimis (.3% of the market share). The District Court found that conductor wire and cable (both bare and insulated, aluminum and copper), and insulated conductor (both aluminum and copper), were lines of commerce, but that Alcoa's and Rome's market shares in these broad product markets were insufficient to support a finding *283 of requisite anticompetitive effect, 214 F. Supp., at 518-519a conclusion which the Government does not question here. More substantial market share percentages would be forthcoming, however, if aluminum conductors could be set apart from the rest of the conductor manufacturing industry. Accordingly, the Government asked the District Court to find aluminum conductors in general, and insulated aluminum conductors in particular, to be separate lines of commerce.
The District Court declined to make such a finding, and for good reason. A line of commerce is an "area of effective competition," to be determined in accordance with the principles laid down in our prior decisions. In Brown Shoe, this Court held that there are broad product markets within which there may be "well-defined" and "economically significant" submarkets. 370 U. S., at 325. The Court in that case did not attempt to formulate any rigid standard for determining submarket boundaries, but indicated that a broad-ranging pragmatic evaluation of market realities was required. The federal trial courts were admonished to examine "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Ibid. These "practical indicia" to be considered in determining submarket boundaries express in practical terms the basic economic concept that markets are to be defined in terms of the close substitutability of either product (demand) or production facilities (supply), since it is ultimately the degree of substitutability that limits the exercise of market power, and it is only by delimiting the area of effective competition that an acquisition's competitive effects can be ascertained.
*284 The District Court applied these practical indicia with meticulous care, and found that the conductor industry does not differentiate between copper and aluminum insulated products; that copper and aluminum products are functionally interchangeable; and that there are no unique production facilities, distinct customers or specialized vendors for insulated aluminum conductor products. 214 F. Supp., at 509. The trial judge did not, as the Court implies, ignore the fact that the prices of copper and aluminum insulated products are generally distinct. It explicitly recognized this fact, but concluded on closer examination of the industry that this price difference did not foreclose "actual competition." Ibid. Accordingly, making a practical judgment based on the Brown Shoe submarket indicia, the District Court concluded that insulated aluminum conductor had not been established as a line of commerce. And since the other alleged line of commercealuminum conductor generallywas no more than the sum of bare and insulated aluminum conductors, the court concluded that it, too, could not constitute an "area of effective competition," since as to the insulated segment, important competitive copper elements would be improperly and arbitrarily excluded. Id., at 510.
The District Court, in other words, did a careful and thoughtful job. It applied the proper law, and its reasoning was impeccable. Yet this Court overrules its decision with little more than a wave of the hand. On the basis of two assertions, that the record shows "fabricators of insulated copper conductor are powerless to eliminate the price disadvantage under which they labor and thus can do little to make their product competitive," and that the difference in price between aluminum and copper conductors is "the single, most important, practical factor in the business," both of which are contrary to the explicit findings of the District Court, the Court summarily concludes *285 that aluminum conductor is "for purposes of § 7 a `line of commerce.' "
The District Court found that neither insulated aluminum nor insulated copper conductor products are recognized as a separate economic entity. Insulated products are identified and defined by the industry and reported to the Bureau of the Census in accordance with their function or type, "not according to the metal used as conductor," and manufacturers regard themselves simply as insulators of wire and cable products. Moreover, there is complete manufacturing interchangeability between copper and aluminum, and manufacturers constantly review their product lines and "switch readily from one product or conductor metal to another in accordance with market conditions." As a result, if a fabricator should feel himself at a competitive disadvantage because of his use of copper, he is not, as the Court asserts, powerless to eliminate a price disadvantage. The supply flexibility which this implies exerts a profound restraint upon an aluminum cable manufacturer's power to achieve any sort of market advantage.
The Court points to nothing in the record justifying its second assertion that "price . . . is . . . the single, most important, practical factor in the business." Whether it is or not is a matter of fact, and the trial judge found upon substantial evidence that "[s]ince copper and aluminum products are completely interchangeable from a performance standpoint, utility companies choose between copper and aluminum insulated or covered overhead products solely on the basis of economics. The decision requires evaluation of numerous economic factors in addition to the cost of the wire or cable itself." (Emphasis supplied.) The record amply supports this finding. There was undisputed testimony that in some situations, the final installed cost of aluminum conductor may be greater than its copper counterpart because of other economic factors *286 such as the higher cost of connectors which must be used with aluminum and the fact that the copper-aluminum cost difference becomes less significant the more complex the conductor required for the job. That the copper-aluminum price difference is not always the determining factor is further borne out by other findings of the trial judge, fully supported by the record, that even in areas where aluminum has gained "increasing use," there is a "lively competition between aluminum and copper products"; that the aluminum-copper price difference does not foreclose "actual competition" and that, in fact, "substantial quantities" of the copper version of overhead distribution products are sold.
But even if insulated aluminum conductor is a proper line of commerce, there is no basis in logic, or in the competitive realities of the conductor industry, for lumping together in one line of commerce bare and insulated aluminum conductors. Even the Government does not claim that the two are competitive; different equipment and engineering skills are required for their manufacture and sale; and, as the District Court found, the combination of bare and insulated aluminum conductors is not generally "recognized in the industry as a separate economic entity" or submarket. The grouping of bare and insulated aluminum conductors into one line of commerce, therefore, is not, as the Court says, "a logical extension of the District Court's findings,"[2] but a repudiation of those findings. And it adds nothing to note, as the Court does, that both bare and insulated aluminum conductors are used to conduct electricity and are sold to electrical utilities. All electrical conductors are used for this purpose and sold to these customers. Such a non-sequitur cannot justify the separation of aluminum conductors from the rest of the electrical conductor field.
*287 The short of it is, there is here no relevant market upon which to predicate a violation of § 7. The District Court correctly described this acquisition as "the combination of an aluminum and an essentially copper manufacturing company," undertaken by Alcoa "in the face of its declining market," for the purpose of obtaining insulating know-how and diversification needed "to overcome a market disadvantage rather than to obtain a captive market . . . or to eliminate a competitor." 214 F. Supp., at 512. I am totally unable to join the Court in its ipse dixit transformation of this essentially "know-how" acquisition into a horizontal merger in violation of § 7.
I would affirm the judgment of the District Court.
NOTES
[1] Section 7 of the Clayton Act, 38 Stat. 731, as amended by the Celler-Kefauver Antimerger Act, 64 Stat. 1125, 15 U. S. C. § 18, provides in relevant part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."
[2] Transmission lines are the "wholesale" lines which carry current at high voltages to substations. Distribution lines are the "retail" lines which carry current from the substations to the consumers.
[3] Cf. United States v. Philadelphia National Bank, 374 U. S. 321, where we held it proper to make commercial banking a line of commerce for purposes of § 7 even though in some services, e. g., the making of small loans, banks compete with other institutions. We said that commercial banks enjoy "such cost advantages as to be insulated within a broad range from substitutes furnished by other institutions." Id., at 356. And see United States v. Bethlehem Steel Corp., 168 F. Supp. 576, 593; Reynolds Metals Co. v. Federal Trade Comm'n, 309 F. 2d 223, 229; United States v. Corn Products Refining Co., 234 F. 964, 976.
[4] The dissent criticizes this grouping of bare and insulated aluminum conductor into one line of commerce. This overlooks the fact that the parties agree, and the District Court found, that bare aluminum conductor and conductor generally (aluminum and copper, bare and insulated) constitute separate lines of commerce. Having concluded above that insulated aluminum conductor and insulated copper conductor are separable even though some interproduct competition exists, the conclusion that aluminum conductor (bare and insulated) is a line of commerce is a logical extension of the District Court's findings.
[5] See the Surplus Property Act of 1944, 58 Stat. 765; United States v. Aluminum Co., 91 F. Supp. 333; United States v. Aluminum Co., 153 F. Supp. 132. Litigation was terminated on June 28, 1957. Ibid. Twelve days later, Alcoa made its first attempt to acquire Rome.
[6] The absorption of Rome by Alcoa was one of the five acquisitions by producers of primary aluminum since 1957. In that year Olin Mathieson (a one-half owner of Ormet, Inc.) acquired Southern Electric Corporation, then the largest independent manufacturer of aluminum conductor; and Kaiser acquired the Bristol, Rhode Island, plant of the U. S. Rubber Company, one of the top 10 in the insulated aluminum field. These moves, and the threat they were thought to pose, were specifically identified as factors influencing Alcoa's 1959 decision to acquire Rome. And it was partly in response to the three prior acquisitions that Reynolds, in 1961, acquired the wire and cable facilities of John A. Roebling's Sons Division of the Colorado Fuel and Iron Company, a small fabricator. Finally, in February 1963, too late to be noted in the record below, Aluminum, Ltd., of Canada announced the acquisition of Central Cable Corporation, one of the largest of the independents. As a result of this series of mergers, there now remain only four nonintegrated fabricators of aluminum conductor whose individual shares of total industry production (based on 1959 figures, the latest in the record) amounted to more than 1%.
[1] See United States v. Philadelphia Bank, 374 U. S. 321.
[2] See note 4 of the Court's opinion.