**UNITED STATES of America,**
**Plaintiff,**

v.

**LOEW'S INCORPORATED et al.,**
**Defendants.**

United States District Court
S. D. New York.

Jan. 20, 1966.

Maurice Silverman, Atty., Antitrust Division Dept. of Justice, Washington, D. C., for the United States.

Booth, Lipton & Lipton, for National General Corp., New York City, Harold A. Lipton and Seymour F. Simon, Chicago, Ill., of counsel.

Breed, Abbott & Morgan, New York City, for amicus curiae; Robert A. Bicks and Stephen R. Lang, Zalkin & Cohen, New York City, of counsel.

PALMIERI, District Judge.

This is a petition by National General Corporation (National) pursuant to Article III, ¶ 7(b) of the Consent Judgment as to Twentieth-Century-Fox Film Corporation for permission to acquire eight conventional theatres, presently operated under the trade name of Town & Country Theatres. Six of these theatres are in Nassau County, Long Island, one in Warwick, Rhode Island, and one in Brooklyn, New York.

It is common ground that Nassau County is a rapidly developing suburban area of New York City with a population of about 1,400,000, well served by public transportation facilities as well as a network of high speed parkways. It is a highly prosperous community.

There is active and substantial competition in the motion picture exhibition business in Nassau County and there is every indication that this competition will increase. Including the six theatres that are here involved, there are 67 conventional theatres in Nassau County in addition to three drive-ins, with a total seating capacity of over 76,000. All but six of these 70 theatres are owned by eleven large circuit exhibitors who operate principally outside Nassau County. Thirty-three theatres customarily play on a first run while seven play first run

for part of the time. The six Nassau County theatres here involved have operated and are intended to be operated on a showcase run[1] for virtually all their playing time. The evidence adduced at the hearing indicated that these theatres represented 18% to 26%[2] of the theatres in Nassau County which have been operating on the showcase run for substantially all of their playing time. The special characteristics of showcase exhibition tend to make this activity a special type of enterprise. It is recognized as such both by the trade and the public. In short, petitioner seeks to acquire a theatre chain, of which six of the eight components comprise an important segment of the competitive activity in first run motion picture exhibition in Nassau County.

Relying upon two recent decisions of the Supreme Court, United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), and United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964), the Attorney General and an *amicus curiae*, Century Circuit, Inc. (Century) oppose the petition on the ground that the proposed acquisition "may be substantially to lessen competition" within the meaning of Section 7 of the Clayton Act.[3] In support of this contention, the following facts, which are substantially undisputed, are cited:

1. Responsible representatives of petitioner made public statements early in 1965 through the motion picture trade press, that petitioner expected to open five to ten theatres on the east coast within the year, as part of a five year expansion program involving a major suburban theatre building program looking to the construction of 60 to 75 new theatres. It should be added, parenthetically, that in two of these statements allusion was made to the necessity for approvals of this Court under the consent decree.

2. A new subsidiary has been formed by petitioner, Fox Eastern Theatres Corporation, to operate its planned eastern circuit.

3. A senior member of petitioner's supervisory staff has been transferred from California to head the operation of the new theatres in the east, with headquarters in New York.

4. Petitioner opened an office in New York City in September 1965 as headquarters for its planned eastern circuit, and for other purposes.

5. The two principal executives of petitioner made a public statement in July 1965 to the effect that it was embarking

---

1. The special characteristics of first run exhibition, known as showcase run, were described at the hearing (pp. 111–12) as follows: (1) Showcase theatres are generally fewer in number than the total number of first run theatres; (2) Showcase generally plays a single feature, while the other first run theatres generally play double features; (3) Showcase generally plays a longer run; (4) Showcase generally charges a higher admission price; (5) Showcase films generally result in a higher gross income; (6) Showcase distribution tends to occur among the newest and best equipped houses. In addition, showcase film rentals are generally more costly (Sylvan Schein affidavit).

2. The petitioner suggests that first run theatres are to be classified on the same basis, regardless of showcase exhibition, and concludes that the percentage is 18% since it proposes to acquire six of 33 first run theatres of the market. But if showcase theatres are considered separately, since there are 23 of them in the relevant market, six of 23 would constitute the higher proportion of 26%.

3. 38 Stat. 731 (1914), as amended, 15 U.S.C. § 18 (1950). The pertinent portion of Section 7 provides:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

upon a $50,000,000 three year, 100 theatre expansion program; that negotiations had been concluded for 32 new theatres and that of these, 13 were in the east. It can reasonably be assumed that of these 13 theatres, four have been involved in applications already submitted to this Court,[4] and eight are involved in the very petition now under consideration.

The Government's opposition to the petition has been vigorously supported by Century appearing as *amicus*. Century is an independent circuit operating 14 theatres in Nassau County, at least 8 of them on a first run basis, and 21 theatres elsewhere. It is the most important exhibitor in Nassau County.[5] It contends, as does the Government, that the proposed acquisition of the Nassau County theatres will violate § 7 of the Clayton Act; that its effect will be "substantially to lessen competition" within the purview of that section; and consequently would unduly restrain competition within the meaning of the consent decree. The Government argues that "what National is doing by acquiring this Circuit is eliminating the potential competition of Town & Country"[6] (p. 77). Century argues that it would be deprived of the benefits of § 7 by being deprived of "a fair shot at the process of competition, at participating in the process of competition" (p. 98).

## The "Potential Competition" Cases Are Not Appropriately Invoked in this Case

The *El Paso Natural Gas* case (supra) and the *Penn-Olin* case (supra), heavily relied on by the Government and the *amicus* in urging denial of the petition, were landmark cases decided within a short time of each other during the same term of the Supreme Court in 1964. Both involved § 7 of the Clayton Act (note 3, supra) and in both cases the Supreme Court reversed judgments for defendants on the ground that a substantial lessening of "potential competition" might result from defendants' acquisitions. The *El Paso* case was the first case in the Supreme Court to turn on the single question of potential competition. The decision ordered a large gas pipeline company (El Paso Natural Gas Co.) to divest itself of a smaller company (Pacific Northwest Pipeline Corp.) allegedly acquired to avoid competition with it in the potentially lucrative California market. Without using the term "potential competition", the opinion defined the area being protected as "the new increments of demand that may emerge with an expanding population and with an expanding industrial or household use of gas" (supra 376 U.S. at p. 660, 84 S.Ct. at p. 1049), stressing that it was dealing with a regulated industry having special characteristics. The Court pointed out that "[t]his is not a field where mer-

---

4. These are Staten Island, New York, Buffalo, New York (2 theatres), and Menlo Park, New Jersey. The construction of the Buffalo theatres has been prevented by local zoning regulations and the project appears to have been abandoned.

5. An interesting sidelight to Century's competitive position is that it operates all the theatres in Huntington, Long Island —four conventional theatres and one drive-in—a situation reminiscent of the closed towns of pre-Paramount decree days. Century's counsel suggested that they were part of a larger sub-market area (pp. 117–18).

6. Town & Country, the seller of the theatres here sought to be acquired, is attempting in good faith to dispose of these holdings for legitimate business reasons having no relationship to petitioner's independent desire for expansion. A letter of Town & Country addressed to National and submitted to the Court set forth the reasons as follows: "Mr. Sinetar and the undersigned regard the transaction with you as a means of terminating our participation in an enterprise which we feel was developed through our imagination and skill. But in its development, because of the need for financing, it acquired many other owners. It is our desire to engage in the theatre exhibition business in the future but without any partners. Our deal with you will make it possible for us to do this." (p. 49). The bona fides of this position was not impugned in any way at the hearing.

chants are in a continuous daily struggle to hold old customers and to win new ones over from their rivals" (supra 376 U.S. at p. 659, 84 S.Ct. at p. 1049).

The *Penn-Olin* case was the first to reach the Supreme Court directly involving the application of § 7 of the Clayton Act to a domestic coporate joint venture. Acknowledging this, the Court added (378 U.S. at p. 169, 84 S.Ct. at p. 1716), "We are, therefore, plowing new ground".[7]

In the *Penn-Olin* case the joint venture was organized to compete in the southeast sodium chlorate market. The corporate organizers were a consumer and distributor of sodium chlorate, Olin Mathiesen Chemical Corp. and a producer of sodium chlorate on the west coast, Pennsalt Chemicals Corp. For about a decade prior to the organization of the joint venture, each parent had seriously considered independent entry into the southeast market, but before either had reached a decision, the joint venture was formed. The district court dismissed the complaint, declining to apply § 7 of the Clayton Act because the Government had failed to show the reasonable probability that *both* parents would have competed independently but for the joint venture. In vacating the judgment and remanding the case to the district court for further consideration, the Supreme Court held that a joint venture "as organized here would be subject to the regulation of § 7 of the Clayton Act" (378 U.S. at p. 161, 84 S.Ct. at p. 1712) and thus within the reasonable-probabilities standard of legality. "There still remained for consideration" the Court said, "the fact that Penn-Olin [the joint venture] eliminated the potential competition of the corporation that might have remained at the edge of the market, continually threatening to enter" (at p. 173, 84 S.Ct. at p. 1718). "Potential competition, insofar as the threat survives [as it would have here in the absence of Penn-Olin], may compensate in part for the imperfection characteristic of actual competition in the great majority of competitive markets" (at p. 174, 84 S.Ct. at p. 1718 quoting from Wilcox, Competition and Monopoly in American Industry, TNEC Monograph No. 21 (1940) 7–8).[8] "Potential competition cannot be put to a subjective test" (at p. 174, 84 S.Ct. at page 1718). "It is not 'susceptible of a ready and precise answer'," (at p. 174, 84 S.Ct. at p. 1718) quoting from the opinion in the *El Paso* case (supra). "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated." (at p. 174, 84 S.Ct. at p. 1719).

Unlike the earlier antitrust statutes, § 7 of the Clayton Act, as amended in 1950 (supra note 3) was said to have been drafted to reach anti-competitive tendencies in their incipiency so that the courts would not be restrained from acting until the consequences of collusive practices had reached their maximum effectiveness. The incipiency doctrine was given

---

7. It should be added that corporate joint ventures are of relatively recent vintage. Their extraordinary growth in recent years has been attributed to their special capacity for assuming highly speculative business risks prohibitive for the independent entrepeneur. Another attribute has been their apparent immunity, until the *Penn-Olin* decision, from Clayton Act litigation. See generally Martin & Berman, Expansion Via Joint Subsidiaries, in Mergers and Acquisitions 83 (American Management Ass'n ed. 1957); Taubman, The Joint Venture and Tax Classification 27–81 (1957).

8. Rahl, Applicability of the Clayton Act to Potential Competition, 12 A.B.A. Antitrust Section Rep. 128, at 136, takes a contrary view:

No economist has said, so far as I know, that potential competition in the abstract is as good a force as actual competition. It would seem that actual competition in being would always be preferable. It is actual competition upon which the Clayton Act has always focused primarily. Anyone who takes the position that the elimination of competition not in being is as serious as elimination of actual competition must assume a heavy burden of proof.

its most comprehensive expression under § 7 in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); cf. United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); and in its *Penn-Olin* decision, the Supreme Court stressed that the mandate of Congress (under § 7) "is in terms of the probability of a lessening of substantial competition, not in terms of tangible present restraint" (378 U.S. at p. 177, 84 S.Ct. at p. 1720). It gave these criteria for the guidance of the trial court in assessing the probability of a substantial lessening of competition (at p. 177, 84 S.Ct. at p. 1720):

> * * * the number and power of the competitors in the relevant market; the background of their growth; the power of the joint venturers; the relationship of their lines of commerce; the competition existing between them and the power of each in dealing with the competitors of the other; the setting in which the joint venture was created; the reasons and necessities for its existence; the joint venture's line of commerce and the relationship thereof to that of its parents; the adaptability of its line of commerce to noncompetitive practices; the potential power of the joint venture in the relevant market; an appraisal of what the competition in the relevant market would have been if one of the joint venturers had entered it alone instead of through Penn-Olin; the effect, in the event of this occurrence, of the other joint venturer's potential competition; and such other factors as might indicate po-

tential risk to competition in the relevant market.

From all that has been said above concerning the *El Paso* and *Penn-Olin* decisions, one can conclude that incipiency standards within the purview of § 7 are elusive and difficult of application. "Potential competition" would seem to escape any quantitative measurement because so much is conjectural and so little rests upon any firm basis for economic analysis. See generally Rahl, Applicability of the Clayton Act to Potential Competition, 12 A.B.A. Antitrust Section Rep. 128 (1958). Cf. Note, Applicability of Section 7 to a Joint Venture, 11 U.C. L.A.L.Rev. 393, 494–505 (1964); Note, A Joint Venture Which May Substantially Lessen Actual or Potential Competition Between Parent Corporations Violates Section 7 of Clayton Act, 43 Texas L.Rev. 400, 406 (1965); 17 Vand.L.Rev. 1502 (1964). In ploughing this new ground, much still remains to be seen before the full meaning of "potential competition" can be discerned. But lack of complete clarity in this concept is only one of numerous obstacles to its application here. There are others.

Petitioner has argued that while its consent judgment was entered after the 1950 Amendment to Section 7 of the Clayton Act, the language of the consent judgment was the language of the Paramount consent judgment[9] entered March 3, 1949, prior to the 1950 Clayton Act Amendment. There is no express language to suggest either that Paramount's judgment was changed by the later congressional amendment, or that the later National judgment incorporated the amendment. The petitioner suggests that the use of language identical to the Paramount decree makes it manifest that the incipiency objectives of § 7 were extraneous to the petitioner's consent judgment.[10] Were this not so, the argument

9. "* * * will not unduly restrain competition".

10. Brown Shoe Co. v. United States, supra, 370 U.S. at pp. 318, 323, and in footnotes 32, 33, 36 and 39 appearing on pp. 318,

319, 321 and 323, 82 S.Ct. on pp. 1520, 1522 demonstrates that § 7 "was intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act" and was "not intended to revert to the Sherman Act test". The quoted

runs, the anomalous result would be that the two decrees growing out of the same antitrust litigation, relating to controls affecting the same industry, and having identical language, have different meanings.

■ While this is an alluring argument, it must be rejected. There is no *a priori* basis for excluding the application of § 7 to the divorced circuits now operating under the Paramount decree and its satellite consent judgments. The evolvement of antitrust jurisprudence as manifested, for instance, by the recent *El Paso* and *Penn-Olin* cases, can well provide new judicial horizons not now discernible from the text of consent judgments. While the same language of the consent decrees must be construed in the same manner, it would be anomalous to make of them an enclave secure from the inroads of all antitrust concepts as reflected by the developing jurisprudence of the Supreme Court, or by legislation.

■ However, the alleged infraction of § 7 in this case stands unproven. It is presented as a suggestion from the Attorney General based upon the public statements of petitioner already referred to. The Government urges that since its position is taken in good faith— i. e., that it is not "frivolous" and that it spells out "a possible violation of Section 7", petitioner is thereupon compelled to sustain the burden of proving a non-violation of § 7. This would confront the petitioner as well as the Court with unmanageable burdens. The Government does not suggest the quantum or quality of proof it must produce for such a showing. In order to keep these proceedings within manageable compass, the party asserting the violation should bear the burden of proving it. But whether the Government can properly confront a petitioner in an acquisition proceeding with proof of a §

7 violation is a matter which need not now be decided.

■ The brief of the *amicus* Century uses many quotations from a variety of antitrust opinions in an effort to demonstrate that the petition should be denied. The Government brief as well cites many cases involving different competitive concepts and markets. These many citations and quotations bring to mind the statement of the District Court in United States v. United Shoe Machinery Corp., 110 F.Supp. 295 (D.C.Mass.1953), aff'd, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954): " * * * And in connection with the Sherman Act, it is delusive to treat opinions written by different judges at different times as pieces of a jig-saw puzzle which can be, by effort, fitted correctly into a single pattern." (110 F.Supp. p. 342). The *amicus* Century and the Government refer emphatically and repeatedly to the *El Paso* and *Penn-Olin* cases. Both of these cases, as the above discussion indicates, are clearly distinguishable on their facts. The case presently before this Court does not involve a corporate merger replacing the possible competitive activities of one of the parents as in *Penn-Olin* in an area of limited competition; nor does it involve a regulated industry like that in *El Paso* having peculiar production and marketing characteristics. As the Court was careful to point out in *El Paso*, it was not there dealing in "a field where merchants are in a continuous daily struggle to hold old customers and to win new ones over from their rivals". It is precisely this field which is involved here. The use of language from *El Paso* or *Penn-Olin* here is a use out of context for a purpose it was not intended to serve. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1363 (1965).

language appears in footnotes 32 and 33 at pp. 318 and 319, 82 S.Ct. at p. 1520. See also Times-Picayune Pub. Co. v. United States, 345 U.S. 594 at 609-10,

610, 73 S.Ct. 872, 97 L.Ed. 1277. There is no question, of course, that the Paramount decree and the consent judgments are based upon the Sherman Act.

National's Consent Decree In the Appropriate Frame of Reference Applicable to Petitioner's Proposed Acquisition in this Case

The relative novelty of application of § 7 stands in marked contrast to the many years during which the Paramount decree and its progeny have been administered. Every entry into every market by each of the divorced circuits has been scrutinized. There have been scores of proceedings, forty-seven in 1965 alone, involving proposed acquisitions calling for application of the measure of legality first established by the Paramount decree, and transposed *in haec verba* in National's consent judgment, that petitioner "shall show to the satisfaction of the Court, and the Court shall first find, that the acquisition will not unduly restrain competition." Neither the Government nor an acquiring circuit has ever taken an appeal from an acquisition petition or from a decision construing provisions of the judgment. In the only two instances where appellate procedures have been invoked, they were not invoked by parties to the litigation, but by *amici* [11] and the appellate courts affirmed the actions of this Court. This substantial background of proceedings, quieted and settled to the apparent satisfaction of the interested parties, supplies an appropriate basis for the disposition of this petition.

The very public statements made by petitioner about its proposed entry into the eastern market referred to the necessity for Court approval. It strains the truth to say that petitioner "threatens" to enter the eastern market. It would be more accurate to say that the petitioner publicly announced that it must continue to transact business with whatever burdens the consent judgment imposes and that its every proposed acquisition (i. e., "threat to enter a new market") will be subject to the restrictions of that judgment. The petitioner cannot acquire a single theatre without formal application and Court approval—a considerable burden on its business initiative and freedom. That it has this burden is common knowledge in the trade. This is apparent from the appearance of numerous and often powerful competitors who have been diligent and vocal in their objections expressed in acquisition proceedings. The settled procedures by which conclusions have been arrived at over a period of many years under the measure of legality established by the consent judgment should not be lightly thrust aside.

Both the Government and the *amicus* Century have urged that petitioner's position is vulnerable because the proposed acquisitions in Nassau County involve existing theatres presently in operation (and therefore part of an existing competitive pattern) rather than theatres to be constructed. It is an aspect of the "potential competition" argument made by them under § 7 of the Clayton Act. In this instance, the acquiring theatre company is allegedly eliminating the competition of the seller theatre company by the transaction of purchase and sale. This, the argument runs, would not be the case if the purchaser constructed a new theatre instead of buying one. Pushed to its logical extreme it would freeze all parties to their present positions unless they undertook expansion by construction only. No one could buy. No one could sell. But anyone could construct.

▮ The short answer to this argument is that the decree makes no such distinction. Nothing in the history of the Paramount litigation or in the decree itself suggests that acquisitions should be limited to newly constructed theatres. The Government's brief correctly states that this Court has never denied a petition seeking entry into "new markets with new theatres". But that is not a basis for implying that the acquisition of an existing theatre facility is inconsonant with the decree. The competitive factors

11. Wometco Television & Theatre Co. v. United States, 355 U.S. 40, 78 S.Ct. 120, (1957) (per curiam) ; Sameric Corp. of Valley Forge v. Palmieri, decided April 20, 1964 from the bench by the Court of Appeals for the Second Circuit.

can be appraised in either contingency and the decree has been so construed for many years. The *Lone Star* acquisition by Stanley Warner, 1962 Trade Cas. 77074 (S.D.N.Y.1962), decided by this Court, presents many points of similarity with this petition. Although the Government opposed on other grounds, the "potential competition" argument was not urged in that case, despite the fact that § 7 as amended in 1950 was on the statute books at the time, because the *Lone Star* petition antedated the *El Paso* and *Penn-Olin* decisions. (Statement of Assistant Attorney General Silverman, p. 77).

Nor are the contentions based upon naked economic size valid. Under the picture by picture, theatre by theatre licensing requirements of the consent judgment size cannot bring about competitive advantage. The consent judgment has effectively prevented any recurrence of the evils, it was intended to correct; and the Paramount decree and its progeny are generally regarded as the most effective antitrust decrees ever devised.[12] The attempt of the *amicus* to brand petitioner with the attributes of dominance and competitive advantage in its national operations is not substantiated.

■ The consent judgment itself fixed the possible acceptable size of petitioner and this size is very far from having been attained. The petitioner's predecessor was allowed by this judgment to operate 451 theatres, a number arrived at by divestiture of its interests in 183 theatres. In addition to this divestiture, however, petitioner divested itself of 273 other theatres for economic and other reasons. Counting the 29 acquisitions effected under the judgment, petitioner has operated about 220 theatres for the past several years—slightly less than half the number allowed by the consent judgment. Most of these theatres are over 30 years old and most of them are situated in California and other western states. Any attack based upon the petitioner's size is foreclosed by these facts.

No substantial issues have been raised with respect to the two theatres sought to be acquired by petitioner in Brooklyn, New York, and in Warwick, Rhode Island. Both are situated in large markets with large populations and both areas are marked by active competition in the motion picture exhibition field. The petitioner has no theatres in either area.

■ Accordingly, with respect to all the proposed acquisitions here involved, the petitioner has sustained its burden of establishing that they will not unduly restrain competition. Since two of the theatres in question are in Glen Cove the Government may, if it is so advised, propose restrictions with respect to showcase operation of one of them.

The petition is granted.

Submit order on notice.

---

12. The following is excerpted from an address of Hon. Victor R. Hansen, Assistant Attorney General in charge of the Antitrust Division, delivered on October 23, 1958, before a convention of the Theatre Owners of America:

You are all familiar with the landmark case of United States v. Paramount. [334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948)]. There were many things that needed to be righted in the motion picture industry of twenty years ago when the *Paramount* case was brought. Free and equal competition within the motion picture industry itself did not exist two decades ago. Essentially, the industry was set up on the basis of a system of favored theatres. Contentions to the contrary notwithstanding, this system of favored theatres has been abolished; and this is the great achievement of the *Paramount* case. Today no distributor involved in the *Paramount* case is free arbitrarily to select the theatre to which an offered run of a given picture will be licensed. Theatres competing against each other on that run must all be given an equivalent opportunity to license the picture; and the Antitrust Division is there to see that such opportunity is not withheld.

Not only is there an injunctive requirement in the *Paramount* judgments to this effect, but far-reaching divorcement and divestiture relief has created the necessary climate for such injunctive relief to work.