# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1638

_____

HDC Medical, Inc.,

              Appellant,

    v.

Minntech Corporation,

              Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*

_____

Submitted: October 19, 2006
Filed: January 25, 2007

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

HDC Medical, Inc ("HDC") and Minntech Corporation ("Minntech") are competitors in a specialized medical-device market. HDC brought suit against Minntech alleging exclusionary and predatory conduct in violation of the Sherman Act. The district court[1] granted Minntech's motion for summary judgment. HDC appeals. We affirm.

-------

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

## I. *Background*

Both HDC and Minntech manufacture dialyzer reprocessing machines. Minntech manufactures a dialyzer reprocessing machine called "the Renatron," while HDC produces "the MAKY." Dialyzer reprocessing machines work in conjunction with dialyzers. Dialyzers, which filter blood waste products, serve as an artificial kidney in hemodialysis. Dialyzers come in two forms: single-use and multiple-use. Single-use dialyzers are disposable and can be used only once. Multiple-use dialyzers, on the other hand, can be used repeatedly if cleaned by a dialyzer-reprocessing machine. Dialyzer reprocessing machines sanitize multiple-use dialyzers using chemical mixtures called reprocessing solutions. Minntech produces a reprocessing solution marketed as Renalin. HDC Medical also produces a reprocessing solution marketed as Peracidin.

Beginning in 2000, Minntech began modifying the design of the Renatron. These modifications, HDC alleges, rendered HDC's reprocessing solution, Peracidin, incompatible with the Minntech dialyzer reprocessing machines, the Renatron. Additionally, these modifications, HDC alleges, were accompanied by Minntech warranty manipulations, slander of the HDC products and tying arrangements intended to push HDC out of the reprocessing solution market.

HDC sued Minntech, alleging that Minntech's actions violated the Sherman Act, 15 U.S.C. §§ 1, 2. Minntech successfully moved for summary judgment and the case was dismissed. The district court dismissed HDC's monopoly claim after determining no genuine issue of material fact existed regarding Minntech's power in the relevant market. The district court also dismissed HDC's attempted monopoly claim after determining that no genuine issue of material fact existed regarding Minntech's alleged anticompetitive conduct or Minntech's dangerous probability of success.

II. *Discussion*

"We review de novo a grant of summary judgment, considering the facts in the light most favorable to the nonmoving party. Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Nat'l Am. Ins. Co. v. W & G, Inc.*, 439 F.3d 943, 945 (8th Cir. 2006) (internal citations omitted). The courts should enter summary judgment on the merits in antitrust litigation sparingly. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987). However, where there has been ample opportunity for discovery, summary judgment is appropriate in antitrust cases, just as in any other litigation, upon a showing of an absence of any genuine issue of material fact. *Willmar Poultry Co. v. Morton-Norwich Prods, Inc*. 520 F.2d 289, 293 (8th Cir. 1975).

A. *Monopolization Claim*

A prima facie claim of monopolization under the Sherman Act requires a plaintiff to show that the defendant "possessed monopoly power in the relevant market" and "willfully acquired or maintained that power." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir. 1992). To establish that a defendant possesses the requisite market power required for monopolization liability, a plaintiff must establish that the defendant has a dominant market share in a well-defined relevant market. *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994).

The relevant product market is a question of fact, which the plaintiff bears the burden of proving. *Id.* We have noted, "Antitrust claims often rise or fall on the definition of the relevant market." *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir. 1995). The relevant market has two components—a product market and a geographic market. *Id.* Here, the parties dispute only the relevant product market. The district court found that single-use and multiple-use dialyzers are competitors in the same market and concluded that Minntech did not possess monopoly power in the

relevant market. HDC, however, contends that single-use and multiple-use dialyzers do not compete in the same product market.

The boundaries of the product market can be determined by the reasonable interchangeability or cross-elasticity of demand between the product itself and possible substitutes for it. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)*; United States v. Archer-Daniels-Midland Co.,* 866 F.2d 242, 246 (8th Cir. 1988) *cert. denied*; 493 U.S. 809 (1989). In other words, the product market can be determined by analyzing how "consumers will shift from one product to the other in response to changes in their relative costs." *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981). To conduct this inquiry, the courts must weigh several factors including, industry or public recognition of the products as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Brown Shoe Co.,* 370 U.S. at 325.

The district court granted Minntech's motion for summary judgment after finding that multiple-use dialyzers and single-use dialyzers have identical uses. HDC does not dispute this finding but argues that the district court ignored case law suggesting that significant price differences between identical-use products can establish reasonable interchangeability, and thus support a jury's inference that two separate product markets exist. We disagree.

The Supreme Court has repeatedly held that a price differential alone is insufficient to infer two separate product markets. "[P]rice is only one factor in a user's choice between one [product] or the other. That there are price differentials between the two products . . . are relevant matters but not determinative of the product market issue." *United States v. Cont'l Can Co.*, 378 U.S. 441, 455 (1964); *see also Brown Shoe Co.,* 370 U.S. at 326. ("It would be unrealistic to accept Brown's

contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00.")

HDC maintains that other cases from the Court and this circuit suggest that a substantial price differential between two products can, alone, justify the inference of two separate markets. To support this contention, HDC quotes language in *United States v. Aluminum Co. of America*, 377 U.S. 271 (1964), and our holding in *Archer-Daniels-Midland Co.* Both cases are distinguishable.

In *Aluminum Co. of America*, the Supreme Court found two different product markets existed for insulated aluminum and insulated copper cable as used in overhead distribution. Although there were no quality differences between the two products, copper cable was more expensive. *Aluminum Co. of America*, 377 U.S. at 276. HDC heavily relies upon the Court's statement that "to ignore price in determining the relevant line of commerce is to ignore the single, most important, practical factor in the business." *Id.*

However, the Court in *Aluminum Co. of America* used price as only a supporting factor in its ultimate determination that insulated aluminum and insulated copper cable were in different product markets. The Court found most persuasive the fact that insulated aluminum and insulated copper cable had two distinct end uses. "While the copper conductor does compete with aluminum conductor, each has developed distinctive end uses-aluminum as an overhead conductor and copper for underground and indoor wiring, applications in which aluminum's brittleness and larger size render it impractical. And, as we have seen, the price differential further sets them apart." *Id.* at 277. Thus, the Court in *Aluminum Co. of America* reminds lower courts to consider price but also that price alone is not dispositive. Other factors should also be considered.

HDC's reliance upon our holding in *Archer-Daniels-Midland Co.* is also misplaced. In that case we created a narrow exception to the general prohibition against placing great weight on only price differentials to determine the relevant product market, stating:

> While generally a price differential, even a substantial one, is irrelevant for purposes of determining reasonable interchangeability, a large price differential as a result of a government price support raising the price of one product, but not the other, to an artificially high level is a relevant factor. This is true because of the inability of the price supported product to constrain the price of the other product. The artificially high price of sugar does not constrain the price of HFCS; thus, the competition from sugar does not regulate HFCS producers' business behavior. Competition between HFCS producers may be necessary to accomplish this goal. The price differential between sugar and HFCS, at least as a result of government price supports, is sufficient to show that sugar is not reasonably interchangeable with HFCS and thus does not belong in the same relevant product market with HFCS.

866 F.2d at 246.

Here, HDC does not allege governmental interference with the natural function of the dialyzer market; therefore, the *Archer-Daniels-Midland Co.* limited exception does not apply.

HDC offered no evidence, other than a substantial price differential, to support the conclusion that single-use dialyzers are a distinct product market from multi-use dialyzers. Accordingly, we must affirm the district court's grant of summary judgment on HDC's monopolization claim, because HDC failed to create a jury question on the issue of the relevant product market.

## B. *Attempted Monopolization: Anti-competitive Conduct*

"Attempted monopoly claims are aimed at 'the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it.'" *Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 806–807 (8th Cir. 1987) (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 785 (1946)).

To establish an attempted monopolization claim under the Sherman Act, a plaintiff must prove: "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Id.* at 801.

The district court found that HDC offered no evidence to support its allegations of predatory or anti-competitive conduct. The court also found that HDC failed to offer any evidence supporting the allegation that Minntech's conduct had a dangerous probability of success. We agree with both conclusions.

HDC listed several allegedly anticompetitive actions taken by Minntech. We will address the two principal claims: that Minntech's warranty policy was implemented to hamper competition and, second, that Minntech altered the design of two products specifically for the purpose of harming competition.

### 1. *The Warranty Allegation*

HDC alleges that Minntech's warranty policy was implemented to hamper competition. In 1998, Minntech announced that it would not honor a one-year warranty on its reprocessing machines if any product other than Renalin was used in the machine. Minntech justified its warranty policy based upon its inability to predict how its machines would react to another manufacturer's reprocessing solution. In light

-7-

of such uncertainty, Minntech believed that it could not feasibly warrant the performance of the product. Further, the record indicates that Minntech was willing to test the effect a competitor's product had on its machines; however, the competitor would have to pay the cost associated with such tests. The district court determined that this explanation was a legitimate business justification. We agree.

We decided a very similar issue in *Marts v. Xerox, Inc.*, 77 F.3d 1109 (8th Cir. 1996). In that case, Xerox announced that it would void the warranty of its photocopying machine if a consumer used a replacement ink cartridge made by a different manufacturer. Although *Marts* was a tying case, we held that this arrangement did not violate the Sherman Act because "[a]n owner of a new Xerox copier could forego the benefits of the warranty, buy service from Xerox or an independent provider, and purchase cartridges from the vendor of its choice. The end result is the same: customers receive both service and cartridges for their copiers." *Id.* at 1112. We believe the same logic applies here.

"Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." *Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir. 1989). "When a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a [Sherman Act] violation." *Midwest Radio Co., Inc. v. Forum Pub. Co.*, 942 F.2d 1294, 1297–1298 (8th Cir. 1991); *Paschall v. Kan. City Star Co.*, 727 F.2d 692 (8th Cir. 1984). Summary judgment is appropriate when a  defendant's business justification goes unchallenged. *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999).

HDC offers no evidence to refute Minntech's legitimate business justification. Accordingly, we hold that the district court did not err by dismissing this allegation of anticompetitive conduct.

## 2. *The Product Modification Allegation*

HDC also alleges that Minntech altered the design of two products specifically for the purpose of harming competition. First, HDC argues that Minntech changed the Renatron's uptake mechanism solely to prevent the use of competitors' reprocessing agents. Second, HDC argues that Minntech modified its barcode scanning device solely to prevent the use of competitors' reprocessing agents.

In response, Minntech explains that the changes to the uptake valve were made in order to aid users in properly diluting the reprocessing agent. Both parties agree proper dilution is essential to ensure patient safety. Patient safety is a valid business justification. HDC does not offer any evidence to indicate that Minntech's explanation is false. Also, HDC does not offer any evidence to suggest Minntech's motive was to engage in anti-competitive conduct.

The alleged changes in the barcode reader fail for similar reasons. HDC argues that changes in the Minntech barcode made it difficult for consumers to use HDC's reprocessing agent in Renatrons. Again, Minntech offered an appropriate business-related justification for the changes, i.e., to aid consumers in keeping better records and to comply with necessary government regulations.

HDC offers no evidence that Minntech engaged in anti-competitive conduct. Minntech maintains, and we agree, that a rational business justification existed for each of the allegations of improper conduct. HDC fails to offer any evidence to discredit these justifications or to suggest that Minntech held an impermissible motive. Accordingly, we hold that the district court did not err in granting summary judgment in HDC's attempted monopolization claims.[2]

---

[2]HDC also accuses Minntech of slander and illegal tying products. The district court rejected these accusations because there was no evidence in the record to support these allegations. For the reasons expressed by the district court, we agree.

C. *Dangerous Probability of Success*

Lastly, the district court determined that HDC failed to prove Minntech's anti-competitive conduct had a dangerous probability of success. Dangerous probability of success is "examined by reference to the offender's share of the relevant market." *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1181 (8th Cir. 1982). Dangerous probability of successes "should be evaluated as of when the alleged anticompetitive events occurred." *Gen. Indus. Corp.,* 810 F.2d at 807 (8th Cir. 1987). HDC argues the district court used data from the year 2005 rather than data from the time in question in assessing Minntech's dangerous probability of success. We disagree.

HDC's allegation is simply not supported by the record. The court's memorandum opinion and order clearly show that its analysis began with the year 2000—the only year for which HDC provided concrete data. Accordingly, the district court did not err in concluding that HDC did not prove a dangerous probability of success.

III. *Conclusion*

After a careful review of the considerable record in this case, we conclude that Minntech was entitled to judgment as a matter of law. HDC failed to show that genuine issues of material fact exist in either its monopolization or its attempted monopolization claims. We therefore affirm the judgment of the district court.

_____

-10-